# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE RURAL/METRO CORPORATION STOCKHOLDERS LITIGATION

) Consolidated
) C.A. No. 6350-VCL

## OPINION

Date Submitted: July 28, 2014
Date Decided: October 10, 2014

Joel Friedlander, Jeffrey M. Gorris, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Randall J. Baron, David Knotts, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; *Attorneys for Plaintiffs*.

Patricia R. Urban, Seton C. Mangine, PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware; Alan J. Stone, MILBANK, TWEED, HADLEY & McCLOY LLP; *Attorneys for Defendant RBC Capital Markets, LLC*.

**LASTER, Vice Chancellor.**

The post-trial decision in this action held RBC Capital Markets, LLC ("RBC") liable to a class of stockholders of Rural/Metro Corporation ("Rural" or the "Company") for aiding and abetting breaches of fiduciary duty by the board of directors of Rural (the "Board"). *In re Rural/Metro Corp. S'holders Litig.*, 88 A.3d 54 (Del. Ch. 2014) [hereinafter "Liability Opinion"]. This decision sets the amount of RBC's liability to the class at $75,798,550.33, representing 83% of the total damages that the class suffered. Pre- and post-judgment interest is awarded at the legal rate from June 30, 2011, until the date of payment.

## I. FACTUAL BACKGROUND

This decision relies on the facts as found in the Liability Opinion. As to new issues not reached in the Liability Opinion, the facts are drawn from the evidentiary record created at trial and finalized on December 17, 2013, when the court denied Rural's application to supplement the record. *In re Rural/Metro S'holders Litig.*, 2013 WL 6634009 (Del. Ch. Dec. 17, 2013) [hereinafter "Trial Record Opinion"].

### A. The Merger

On March 28, 2011, Rural announced that it was being acquired by Warburg Pincus LLC ("Warburg") in a transaction that implied an equity value for the Company of $437.8 million (the "Merger"). Two stockholders filed lawsuits challenging the Merger, which were consolidated into this proceeding. On June 30, 2011, the Merger closed, and each publicly held share of Rural common stock was converted into the right to receive $17.25 in cash.

1

The original complaint named as individual defendants Eugene Davis, Earl Holland, Conrad Conrad, Henry Walker, Christopher Shackelton, Robert Wilson, and Michael DiMino. Each served as a member of the Board before the Merger. DiMino was Rural's President and CEO; the other individual defendants were outside directors. The complaint contended that the individual defendants breached their fiduciary duties in two ways: first, by making decisions that fell outside the range of reasonableness during the process leading up to the Merger and when approving the Merger (the "Sale Process Claim"), and second, by failing to disclose material information in the definitive proxy statement (the "Proxy Statement") that the Company issued in connection with the Merger (the "Disclosure Claim"). The complaint also named as defendants Warburg and its two acquisition subsidiaries and contended that they aided and abetted the individual defendants' breaches of fiduciary duty. Oddly, the complaint named Rural itself as a defendant, even though the complaint only asserted claims for breach of fiduciary duty and aiding and abetting breaches of fiduciary duty. Neither species of claim can be asserted against the corporation whom the fiduciaries serve.

On February 10, 2012, the plaintiffs filed an amended complaint that continued to assert both the Sale Process Claim and the Disclosure Claim, but modified those theories and added more supporting allegations. The amended complaint omitted the claim against Warburg and its acquisition subsidiaries and dropped Wilson from the list of individual defendants, because he had not voted on the Merger.

On August 29, 2013, the plaintiffs filed a second amended complaint that added claims against RBC and Moelis & Company LLC ("Moelis"). RBC acted as Rural's lead

2

financial advisor during the process that led to the Merger. Moelis served as Rural's secondary financial advisor in a role junior to RBC. The second amended complaint contended that RBC and Moelis aided and abetted the individual defendants in breaching their fiduciary duties. It remained the operative pleading through trial.

On October 24, 2012, the court entered a scheduling order setting trial for May 6-9, 2013. During the pre-trial proceedings, the court granted a contested motion for class certification. The class was defined as

> all holders of common stock of Rural Corporation at any time from March 28, 2011 through and including June 30, 2011, whether beneficial or of record, including their legal representatives, heirs, successors in interest, transferees and assigns of such foregoing holders, excluding the Defendants, Warburg Pincus, LLC, and Coliseum Capital Management, LLC, and their associates, affiliates, legal representatives, heirs, successors in interest, transferees and assignees.

Dkt. 185, ¶ 1 (the "Class"). The parties have stipulated that the Class comprises 21,900,133 shares.

## B. The Agreements In Principle

On April 8, 2013, all of the parties filed pre-trial opening briefs, and the case appeared to be headed for trial against all of the defendants. On April 25, all of the parties other than Moelis filed pre-trial answering briefs. By letter, the plaintiffs explained that they had reached an agreement in principle with Moelis on a settlement that contemplated a payment of $5 million to the Class. The plaintiffs asked the court to sever the claims against Moelis and to excuse Moelis from attending trial. The letter proposed that if the settlement with Moelis was later terminated or not approved, then the plaintiffs and Moelis would have a separate trial on the claims against Moelis.

3

The plaintiffs' letter attached a term sheet reflecting the agreement in principle, which included the following points:

2.    Moelis denies all allegations of wrongdoing and liability to Plaintiff and the class, and the settlement does not constitute any admission of wrongdoing or liability.

3.    All claims against Moelis to be dismissed with prejudice.

4.    Moelis to be given a general release on behalf of all Class members.

5.    Plaintiff and the Class agree, pursuant to 10 *Del. C.* § 6304(b), that the damages recoverable against all the other tortfeasors will be reduced to the extent of the pro rata share of Moelis.

6.    Moelis has the right (but not the obligation) to terminate the settlement if the Court does not enter a final order as part of final approval of the settlement (a) barring any claims against Moelis by any other alleged tortfeasor for contribution (whether denominated as contribution, indemnification or otherwise); and (b) expressly preserving such rights as Moelis may have to contractual indemnification from Rural. . . .

Dkt. 251.

On April 26, 2013, the court held a teleconference to discuss the Moelis settlement. The other defendants explained that they had not had time to determine whether they objected to the proposal to sever the claims against Moelis and to excuse Moelis from attending trial. The other defendants wanted to consider whether to assert cross-claims against Moelis for contribution and to evaluate how issues of relative fault might be addressed. Counsel asked to have until April 29 to respond.

On April 29, 2013, the court held a follow-up teleconference. The individual defendants informed the court that they had reached an agreement in principle of their own with the plaintiffs that contemplated a payment of $6.6 million to the Class. RBC

4

then advised the court that it would be amending its answer to add cross-claims for contribution in accordance with a stipulated procedure. RBC also requested a continuance, which the plaintiffs opposed. The court took the question of a continuance under advisement.

On April 30, 2013, the plaintiffs provided the court with a term sheet documenting their agreement in principle with Rural and the individual defendants, referred to collectively in the term sheet as the "Rural/Metro Defendants." The term sheet included the following provisions:

2.      The Rural/Metro Defendants deny all allegations of wrongdoing and liability to Plaintiff and the Class, and the settlement does not constitute any admission of wrongdoing or liability.

3.      All claims against the Rural/Metro Defendants to be dismissed with prejudice.

4.      The Rural/Metro Defendants to be given a general release on behalf of all Class members.

5.      Plaintiff and the Class agree, pursuant to 10 *Del. C.* § 6304(b), that the damages recoverable against all the other tortfeasors will be reduced to the extent of the pro rata share of the Rural/Metro Defendants.

6.      The Rural/Metro Defendants have the right (but not the obligation) to terminate the settlement if the Court does not enter a final order as part of final approval of the settlement barring any claims against the Rural/Metro Defendants by any other alleged tortfeasor for contribution.

Dkt. 270. As with Moelis, the plaintiffs proposed to sever the claims against the Rural/Metro Defendants for potential disposition later if the settlement was not approved. Rather than excusing the individual defendants from attending trial, the term sheet

contemplated that the Rural/Metro Defendants would make DiMino and any other individual defendant that the plaintiffs might reasonably request available as witnesses.

Later in the day on April 30, 2014, the court issued a letter ruling denying RBC's request for a continuance. On May 2, the court entered an order severing and staying the claims against the Rural/Metro Defendants. The parties submitted a stipulation and proposed order severing and staying the plaintiffs' claims against Moelis. The stipulation granted RBC leave to file its cross-claims for contribution. The recitations in the stipulation included the following:

> RBC contends that there was no breach of fiduciary duty or aiding and abetting such a breach and that the claims against defendants are without merit, but seeks to amend its answer to assert a cross claim solely for the purposes of determining at trial the relative degrees of fault for purposes of 10 *Del. C.* § 6304 in order to secure a reduction of the damages recoverable against it to the extent of the pro rata share of Moelis and/or the Rural/Metro Defendants based on relative degrees of fault (the "Cross Claim").

Dkt. 296. Notably, in this recitation, RBC represented that it was not contending that the individual defendants breached their fiduciary duties or that Moelis had aided and abetted any breach. The court entered the order.

As contemplated, RBC filed an amended answer that asserted cross-claims for contribution against the Rural/Metro Defendants and Moelis. Paragraph 4 of the cross-claim stated that

> RBC denies all liability to Plaintiff. However, in the event any monetary liability is assessed in favor of Plaintiff for any of the claims asserted in this Action, RBC asserts a cross claim against the Rural/Metro Defendants and Moelis solely for purposes of enabling the Court to make an appropriate determination of the relative degrees of fault as between RBC and the other defendants for the sole purpose of reducing the damages recoverable

6

against RBC pursuant to 10 *Del. C.* § 6304 to the extent of the pro rata share of the other defendants based on relative degrees of fault.

Dkt. 296. Consistent with the stipulation, RBC's cross-claim did not actually allege any wrongdoing by the Rural/Metro Defendants or Moelis that could give rise to liability to the Class.

As a result of the agreements in principle, the case went to trial solely against RBC. During trial, RBC did not contend that the individual defendants breached their fiduciary duties or that Moelis aided and abetted a breach of duty. Rather, RBC proceeded at trial consistent with the position it staked out in the Pre-Trial Stipulation and Order: "RBC disputes Plaintiff's claims and contends that . . . the Rural/Metro directors did not breach their fiduciary duties in connection with the Merger." Dkt. 292 at 2. RBC did not seek to prove that any of the individual defendants or Moelis were joint tortfeasors and liable to the plaintiffs for money damages. Nor did RBC seek to establish that, under principles of relative fault, RBC's share of any potential liability should be reduced and some or all of the other defendants' shares of liability increased. In its post-trial brief, RBC argued only that if it were found liable, then it should be entitled to contribution.

## C. The Settlement

On August 5, 2013, the plaintiffs, the individual defendants, and Moelis submitted a 38-page Stipulation and Agreement of Compromise and Settlement with a proposed form of order. Dkt. 323 (the "Settlement Stipulation"). The terms of the Settlement Stipulation were conditioned on court approval.

The Settlement Stipulation memorialized the terms of the agreements in principle by granting expansive releases to Rural, the individual defendants, Moelis, and their affiliates—but excluding RBC—and foreclosing RBC's ability to seek contribution. Paragraphs 12 and 13 stated:

12. . . . It is the intention of the Settling Parties that the Settlement eliminate all further risk and liability relating to the Released Plaintiffs' Claims and the Released Settling Defendants' Claims and that the Settlement shall be a final and complete resolution of all disputes asserted or which could be or could have been asserted with respect to the Released Plaintiffs' Claims and the Released Settling Defendants' Claims, including without limitation any third party claims for contribution in accordance with 10 *Del. C.* § 6304 and any similar laws or statutes; provided, however, that nothing herein shall release or otherwise affect any claims for contribution or indemnity between or among Defendants and/or their insurance carriers.

13. Lead Plaintiff and the Class agree pursuant to 10 *Del. C.* § 6304(b) that the damages recoverable against non-settling defendant RBC and any other alleged tortfeasor will be reduced to the extent of the pro rata shares, if any, of Moelis and the Rural/Metro Defendants.

*Id.* at 22-23.

On November 19, 2013, the court conducted a hearing on the settlement. RBC did not object to the terms of the settlement either before or during the hearing. The court approved the settlement and entered the proposed form of order, which contained the following provisions:

16. Any claims against Moelis (and its employees, representatives and affiliates) by any other alleged tortfeasor for contribution (whether denominated as contribution, indemnification or otherwise, but not including contractually based claims by Rural/Metro arising under the January 10, 2011 Engagement Letter, as to which the parties thereto reserve any and all rights or defenses) are hereby barred.

18. Any claims against the Rural/Metro Defendants (and Rural/Metro Corporation's employees, representatives and affiliates) by any other alleged tortfeasor for contribution (whether denominated as contribution, indemnification or otherwise, but not including contractually based claims arising under the January 10, 2011 Engagement Letter, if any, against the Rural/Metro Defendants, as to which the parties thereto reserve any and all rights or defenses) are hereby barred.

* * *

20. Pursuant to 10 *Del. C.* §6304(b) the damages recoverable against non-settling defendant RBC and any other alleged tortfeasor will be reduced to the extent of the pro rata shares, if any, of Moelis and the Rural/Metro Defendants.

Dkt. 351 (the "Partial Final Judgment"). This decision refers to the settlement among the plaintiffs, the Rural/Metro Defendants, and Moelis that was memorialized in the Settlement Stipulation and implemented through the Partial Final Judgment as the "Settlement."

**D. The Liability Opinion**

On December 17, 2013, the court issued the Trial Record Opinion, which rejected RBC's attempt to supplement the trial record by having the court consider a declaration from Rural's then-CFO that was filed two years after the Merger closed. On March 7, 2014, the court issued the Liability Opinion.

As to the Sale Process Claim, the Liability Opinion held that the individual defendants breached their fiduciary duties by making decisions, taking actions, and allowing steps to be taken that fell outside the range of reasonableness, which the Liability Opinion held was the applicable standard of review. The first occasion when

9

their conduct fell outside the range of reasonableness was when the Board allowed Shackelton and RBC to initiate a sale process in December 2010, without Board authorization and contrary to the Board's instruction that the Special Committee should simply pursue "an in-depth analysis of the alternatives discussed during the [December 8, 2010] meeting." Liability Op., 88 A.3d at 91. This ruling relied in part on findings that RBC designed the sale process to run in parallel with a process being conducted by Emergency Medical Services Corporation ("EMS")—the parent company of American Medical Response ("AMR") and Rural's lone national competitor in the ambulance business—and that "RBC did not disclose that proceeding in parallel with the EMS process served RBC's interest in gaining a role on the financing trees of bidders for EMS." Id.

The second occasion was when the Board approved the Merger. Id. at 94. During the final negotiations between Rural and Warburg, the Board failed to provide active and direct oversight of RBC. As a result, when it approved the Merger,

> the Board was unaware of RBC's last minute efforts to solicit a buy-side financing role from Warburg, had not received any valuation information until three hours before the meeting to approve the deal, and did not know about RBC's manipulation of its valuation metrics. Under the circumstances, the Board's decision to approve Warburg's bid lacked a reasonable informational basis and fell outside the range of reasonableness.

Id.

As to the Disclosure Claim, the Liability Opinion held that the individual defendants breached their fiduciary duties by providing materially misleading information in the Proxy Statement. The plaintiffs proved at trial that "[i]nformation that

10

RBC provided to the Board in connection with its precedent transaction analyses was false, and that false information was repeated in the Proxy Statement." *Id.* at 104.

> RBC told the directors that it used "Wall Street research analyst consensus projections" to derive Rural's EBITDA for 2010. The "consensus projections" were neither analyst projections, nor did they represent a Wall Street consensus. The figures were actually Rural's reported results, not projections, and RBC used the reported figures without adjusting for one-time expenses, which was contrary to the Wall Street consensus. The resulting figure that RBC used in the precedent transaction analysis was $69.8 million. The Proxy Statement elsewhere identified Rural's Adjusted EBITDA for 2010 as $76.8 million, which adjusted for one-time expenses, and identified Rural's Pro Forma Adjusted EBITDA as $83.7 million. The Proxy Statement also noted RBC adjusted the guideline target companies' EBITDA in its precedent transaction analysis "to account for ... certain one-time expenses."

*Id.* at 104-05 (internal citations omitted).

The plaintiffs also proved at trial that information RBC provided about its conflicts of interest was false:

> The Proxy Statement stated that RBC received the right to offer staple financing because it "could provide a source for financing on terms that might not otherwise be available to potential buyers of the Company...." This statement was false. The Board never concluded that RBC could provide financing that might otherwise not be available, and no evidence to that effect was introduced at trial. In December 2010, RBC told the Special Committee that the credit markets were open and receptive to acquisition financing, and they remained so for the duration of the sale process.

*Id.* at 106 (internal citations omitted). This statement also constituted a partial disclosure which "imposed on the Rural directors a duty to speak completely on the subject of RBC's financing efforts." *Id.* The Proxy Statement did not describe how RBC used the initiation of the Rural sale process to seek a role in the EMS acquisition financing, did not disclose RBC's receipt of more than $10 million for its part in financing the

11

acquisition of EMS, and said nothing about RBC's lobbying of Warburg after the delivery of Warburg's fully financed bid while RBC was developing its fairness opinion. *Id.*

For purposes of the plaintiffs' claim against RBC for aiding and abetting a breach of duty, the Liability Opinion only needed to determine that the directors' conduct fell outside the range of reasonableness. The plaintiffs did not ask the court to go further and categorize the defendant directors' breaches as either breaches of the duty of loyalty or the duty of care. Nor did the plaintiffs address or attempt to overcome the defendant directors' potential entitlement to exculpation under Section 102(b)(7) of the Delaware General Corporation Law (the "DGCL"). 8 *Del. C.* § 102(b)(7). Because the plaintiffs were not seeking to impose liability on the defendant directors, they did not ask the court to rule on the availability of exculpation. RBC did not either. The Liability Opinion observed that "[t]he plaintiffs did not press a loyalty claim in their post-trial briefing, and when advancing its contribution claim, RBC did not argue for director-by-director determinations of culpability." 88 A.3d at 89. The Liability Opinion did not determine, for purposes of either the Sale Process Claim or the Disclosure Claim, that any of the directors breached the duty of loyalty or failed to act in good faith. The Liability Opinion commented that Shackelton, Davis, and DiMino each faced personal circumstances that inclined them towards a near-term sale of Rural, but the Liability Opinion only described those interests without making any findings. *Id.* at 64-65.

The Liability Opinion did not make any findings regarding whether Moelis knowingly participated in a breach of fiduciary duty. RBC did not argue that Moelis aided and abetted a breach of duty and that, but for the Settlement, Moelis would have

been a joint tortfeasor and liable to the plaintiffs for money damages. Moelis was not identically situated to RBC. Moelis acted in a secondary role; RBC had the primary role. Like RBC, Moelis had a contingent fee arrangement in which it would only be paid if Rural was sold, but, unlike RBC, Moelis never sought buy-side financing work, nor did it seek to use its position as an advisor to Rural to obtain a role in financing the sale of another company. Like RBC, Moelis did modify its valuation materials in debatable ways that had the effect of lowering the range of fairness and making the Merger price look more attractive, but because Moelis settled with the plaintiff, the Liability Opinion did not delve into the minutiae of Moelis's work, and it did not make any findings as to why Moelis made the changes. *Id*. at 77 n.1.

The Liability Opinion did not fix an amount of damages suffered by the Class. The decision provided inputs to the parties and asked for supplemental expert submissions that the court would consider when determining the fair value for Rural at the time of the Merger. The Liability Opinion also did not address RBC's argument that if it were held liable, then the Delaware Uniform Contribution Among Tortfeasors Act ("DUCATA"), 10 *Del. C.* ch. 63, required that any damages award against RBC be reduced by the aggregate pro rata share of the liability of the defendants who had settled. This argument raised issues of first impression under Delaware law as applied to claims for breach of fiduciary duty and aiding and abetting. The Liability Opinion requested supplemental briefing on these issues.

13

## II.     LEGAL ANALYSIS

This opinion quantifies the amount of damages for which RBC is liable. A defendant who aids and abets a breach of fiduciary duty is jointly and severally liable for the damages resulting from the breach.[1] Under this liability standard, "the injured person

---

[1] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) ("[T]he Court of Chancery properly held HGI, Gumbiner, and Guzzetti jointly and severally liable with the General Partner for aiding and abetting the General Partner's breach of fiduciary duties[.]"); *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168, 170 (Del. 1976) ("[P]ersons who knowingly join a fiduciary in an enterprise which constitutes a breach of his fiduciary duty of trust are jointly and severally liable for any injury which results."); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 619 (Del. Ch. 2010) (imposing joint and several liability on defendants for breaches of fiduciary duty and for aiding and abetting the breach), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010); *Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009) ("Defendants Eastern and Elliott aided and abetted Kirk's breaches of fiduciary duty. Therefore, they are jointly and severally liable for the damages imposed to remedy those breaches."), *aff'd*, 988 A.2d 938 (Del. 2010); *see* RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIAB. § 15 (2000) [hereinafter "Restatement (Third)"] ("When persons are liable because they acted in concert, all persons are jointly and severally liable for the share of comparative responsibility assigned to each person engaged in concerted activity."); RESTATEMENT (SECOND) OF TORTS § 876 (1979) [hereinafter "Restatement (Second)"] ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other[.]").

As a caveat, it is not clear that the Restatements apply directly to the facts of this case. The Restatement (Third) states that it applies to torts involving injury to persons and tangible property, not torts resulting in economic loss alone. Restatement (Third) § 1 & cmt. c (defining "economic loss" as "a financial loss not arising from injury to the plaintiff's person or from physical harm to the plaintiff's property"). The Restatement (Third) does, however, apply to torts such as professional negligence, negligent misrepresentation, and negligent performance of services, which often result in economic loss alone. RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM §§ 4-6 TD No 1 (2012). The Restatement (Second) generally applies to torts involving injury to persons and tangible property, but it also contains sections on negligent misrepresentation and fraud, which frequently result in economic loss alone, as well as sections addressing harm

is entitled to recover his damages from [any] of the tortfeasors, without distinction, subject to the limitation that his total recovery may not exceed the full amount of his damage."[2] A defendant has no right to require the injured party to pursue another tortfeasor first.[3] The plaintiffs therefore had the ability, if they had wished, to sue only RBC, obtain a full judgment from RBC, and recover 100% of their damages from RBC.

Had the plaintiffs proceeded in that fashion, RBC would not have been without remedies. Most notably, RBC could have pursued claims for contribution against other joint tortfeasors. "Contribution is the right of one who has discharged a common liability to recover from another who is also liable." *Reddy v. PMA Ins. Co.*, 20 A.3d 1281, 1284

---

to intangible property interests, like a person's reputation, which do not involve physical harm. Restatement (Second) §§ 525, 552 (fraud and negligent misrepresentation, respectively); *id.* div. 5, ch. 27 Scope Note (discussing liability for reputational damages in cases of libel and slander). Although it is debatable whether either Restatement technically governs the harm that stockholders suffer when their shares are converted into a right to receive merger consideration and the merger has been tainted by breaches of fiduciary duty, the Restatements are at least persuasive authority on the questions presented. Both sides have discussed the Restatements without questioning their relevance. *See* Dkt. 376 at 12-13 (plaintiff); Dkt. 378 at 24-25 (defendant; distinguishing the Restatement (Third) on the facts without challenging applicability).

[2] *Brown v. Comegys*, 500 A.2d 611, 613 (Del. Super. 1985); *accord Campbell v. Robinson*, 2007 WL 1765558, at *2 (Del. Super. June 19, 2007); *see* Restatement (Third) § 10 ("When, under applicable law, some persons are jointly and severally liable to an injured person, the injured person may sue for and recover the full amount of recoverable damages from any jointly and severally liable person."); Restatement (Second) § 875 ("Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.").

[3] *Brown*, 500 A.2d at 613; *Campbell*, 2007 WL 1765558, at *2; *see* Restatement (Third) § 10; Restatement (Second) § 875.

(Del. 2011). This right is what now gives rise to RBC's argument that it should not bear 100% of the damages award.

At common law, Delaware did not recognize a right of contribution among joint tortfeasors.[4] If multiple tortfeasors could be held jointly and severally liable, a plaintiff could pursue any one of them and recover its full damages. That tortfeasor would have to bear the full loss, and it would not have the ability to seek contribution from the other joint tortfeasors. At the same time, the common law held that a release of any one joint tortfeasor operated to release all other joint tortfeasors. A plaintiff therefore could not

---

[4] *DiStefano v. Lamborn*, 81 A.2d 675, 677 (Del. Super. 1951), *disapproved on other grounds*, *Halifax Chick Express, Inc. v. Young*, 137 A.2d 743 (Del. 1958); *accord Cox v. Del. Elec. Coop., Inc.*, 823 F. Supp. 241, 246 (D. Del. 1993) ("The general rule of common law, and that operable in Delaware prior to 1949, is that where two or more individuals jointly or independently negligently cause harm to a plaintiff, one putative defendant is not entitled to contribution from the other."); *Clark v. Teeven Hldg. Co., Inc.*, 625 A.2d 869, 877 (Del. Ch. 1992) ("Under Delaware law, however, there was no right to contribution among joint tortfeasors until the enactment of [DUCATA] on May 7, 1949. . . . Because the substantive right to contribution among joint tortfeasors was not created until the adoption of [DUCATA] in 1949, that right was never a part of equity's traditional jurisdiction in Delaware." (internal citations omitted)); *Clark v. Brooks*, 377 A.2d 365, 368 (Del. Super. 1977) ("The most startling change made by [DUCATA] was to provide a remedy of contribution among tortfeasors."), *aff'd sub nom. Blackshear v. Clark*, 391 A.2d 747 (Del. 1978); *Lutz v. Boltz*, 100 A.2d 647, 647 (Del. Super. 1953) ("Prior to 1949, no right of contribution existed between joint tortfeasors in this State."). Although Delaware did not recognize a right of contribution among tortfeasors, it did recognize a right of equitable contribution among parties to a contract. *Clark v. Teeven*, 625 A.2d at 877; *see also, e.g., De Paris v. Wilm. Trust Co.*, 104 A. 691, 695 (Del. 1918) (recognizing right of contribution among co-guarantors); *Hutchinson v. Roberts*, 11 A. 48, 51 (Del. Ch. 1887), *aff'd*, 17 A. 1061 (Del. 1889) (same); *Jefferson v. Tunnell*, 2 Del. Ch. 135, 139 (Del. Ch. 1847) (same), *rev'd on other grounds*, 5 Harr. 206 (Del. 1849).

settle with one joint tortfeasor for a portion of its damages then seek to recover the balance from other joint tortfeasors.[5]

In 1949, the General Assembly changed the common law rules by enacting DUCATA, which largely tracked the Uniform Contribution Among Tortfeasors Act in the form approved by the National Conference of Commissioners on Uniform State Laws in 1939 (the "Uniform Act of 1939").[6] Section 6302 of DUCATA overrules the common law ban on contribution in tort actions by providing that "[t]he right of contribution exists among joint tortfeasors." 10 *Del. C.* § 6302(a). Section 6304(a) of DUCATA overrules the common law rule that a release of one joint tortfeasor releases all. It states:

> A release by the injured person of 1 joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasor unless the release so

---

[5] *See* Restatement (Second) § 885 cmt. b (citing the common law rule under which "a release given to one of a number of persons who have co-operated in causing a tort or who have failed in the performance of a common duty discharges the others, irrespective of the intent of the parties, although a covenant not to sue one of the parties has no effect upon the liability of the others to the injured person").

[6] The parties do not dispute that DUCATA applies. This court has held that when the defendants' liability arises out of a breach of fiduciary duty, the defendants are liable "in tort" and come within the ambit of DUCATA. *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort[.]"); *accord Frazer v. Worldwide Energy Corp.*, 17 Del. J. Corp. L. 606, 615 n.1 (Del. Ch. 1991) (noting that "[a]ny recovery against the corporate defendants will, of course, be subject to reduction in accordance with the terms of [DUCATA]"). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010) (reviewing Delaware precedents and the history and structure of DUCATA and arguing that DUCATA should apply to claims for breach of fiduciary duty). By extension, DUCATA should apply when a defendant's liability arises out of a claim for aiding and abetting a breach of fiduciary duty, which requires knowing participation in the underlying tort. *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

17

> provides; but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

10 *Del. C.* § 6304(a).

DUCATA also addresses how the release of one joint tortfeasor affects contribution among joint tortfeasors. Section 6302(c) generally prevents a settling joint tortfeasor from seeking contribution from another joint tortfeasor unless the settlement extinguishes the other joint tortfeasor's liability as well. 10 *Del. C.* § 6302(c) ("A joint tortfeasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tortfeasor whose liability to the injured person is not extinguished by the settlement."). This provision permits one or more joint tortfeasors to settle on behalf of themselves and another joint tortfeasor and then pursue that joint tortfeasor for its share of the settlement payment. *See, e.g.*, *In re Telecorp PCS, Inc.*, 2003 WL 22901025, at *3 (Del. Ch. Nov. 19, 2003) (Strine, V.C.) (allowing one defendant to settle with plaintiff and seek contribution against codefendants in a separate action). But Section 6302(c) does not permit a settling joint tortfeasor to seek contribution from a party that still faces liability to the plaintiff. In this case, the Settlement did not extinguish RBC's liability. Consequently, Section 6302(c) prevents the Rural/Metro Defendants and Moelis from seeking contribution from RBC for any portion of the $11.6 million they paid in settlement.

Section 6304(b) addresses the ability of a non-settling joint tortfeasor like RBC to seek contribution from settling joint tortfeasors. It states:

> A release by the injured person of 1 joint tortfeasor does not relieve the 1 joint tortfeasor from liability to make contribution to another joint tortfeasor unless the release is given before the right of the other tortfeasor to secure a money judgment for contribution has accrued, and provides for a reduction, to the extent of the pro rata share of the released tortfeasor, of the injured person's damages recoverable against all the other tortfeasors.

10 *Del. C.* § 6304(b). Under this provision, when a plaintiff settles with one joint tortfeasor before the entry of judgment and grants that party a release, the settlement can grant the joint tortfeasor complete peace, including from claims for contribution, but only if the plaintiff agrees to reduce the amount of damages it can recover from the remaining joint tortfeasors.

> In essence, the non-released tortfeasor's right to recover contribution from the released tortfeasor is protected unless the plaintiff agrees to reduce his recovery against the non-released party by the amount he chose not to collect from the released party. Thus, the plaintiff assumes the risk that the released tortfeasor's pro rata share of recovery is greater than the settlement amount and agrees to reduce any recovery against the non-released tortfeasor by the amount of the released tortfeasor's pro rata share.

*Roca v. Riley*, 2008 WL 1724259, at *2 (Del. Super. Apr. 10, 2008) (footnotes omitted); *accord Farrall v. A.C. & S. Co.*, 586 A.2d 662, 664 (Del. Super. 1990) (explaining that under this scenario, if a plaintiff has released a tortfeasor for less than its pro rata share, "the non-released tortfeasor is protected against having to bear the portion of the released tortfeasor's share which plaintiff failed to collect in the settlement").

In this case, RBC contends that by suing six of the Rural directors and Moelis, the plaintiffs recognized that they were joint tortfeasors along with RBC against whom RBC would have a right of contribution. RBC further contends that because the Settlement extinguished RBC's right of contribution, any damages suffered by the class for which

19

RBC otherwise might be liable must be reduced by the aggregate pro rata share of six individual defendants and Moelis (together, the "Settling Defendants"). The seven Settling Defendants plus RBC make eight, and RBC argues that each defendant should be allocated an equal 12.5% share. RBC claims a settlement credit under Section 6304(b) equal to 87.5% of the damages. RBC would remain liable for 12.5% of the total damages suffered by the Class.

This decision holds that RBC is entitled to a settlement credit, but only in the amount of 17% of the total damages suffered by the Class. This decision enters judgment against RBC for $75,798,550.33, representing 83% of the total damages suffered by the Class.

## A. The Damages Suffered By The Class

The Liability Opinion held RBC liable, but did not determine either the total damages suffered by the Class or RBC's share of liability. This decision finds that the Class suffered damages of $4.17 per share.

A traditional measure of compensatory damages is appropriate for this case:

> The traditional measure of damages is that which is utilized in connection with an award of compensatory damages, whose purpose is to compensate a plaintiff for its proven, actual loss caused by the defendant's wrongful conduct. To achieve that purpose, compensatory damages are measured by the plaintiff's "out-of-pocket" actual loss. Thus, where a merger is found to have been effected at an unfairly low price, the shareholders are normally entitled to out-of-pocket (i.e., compensatory) money damages equal to the

"fair" or "intrinsic" value of their stock at the time of the merger, less the price per share that they actually received.[7]

The "fair value" or "intrinsic value" of the shares held by the class is determined using the same methodologies employed in an appraisal,[8] and this form of damages is

---

[7] *Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000); *accord Kahn v. Tremont Corp. (Tremont I)*, 1996 WL 145452, at *9 (Del. Ch. Mar. 21, 1996) (Allen, C.) (explaining that in a cash out merger or other forced sale, "the shares, even if not entitled to participate in the majority shareholders 'control premium,' must carry at a minimum the *pro rata* value of the entire firm as a going enterprise" (footnote omitted)), *rev'd on other grounds*, *Kahn v. Tremont Corp.*, 694 A.2d 422 (Del. 1997).

[8] *See, e.g.*, *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713-14 (Del. 1983) (equating the fair price measure in fiduciary duty action with the fair value standard in appraisal); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952) (adopting for a breach of fiduciary duty case the valuation standard for appraisal announced in *Tri-Continental v. Battye*, 74 A.2d 71 (Del. Ch. 1950)); *see also Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) (explaining that fair price measure in a breach of fiduciary duty case "flow[s] from the statutory provisions . . . designed to ensure fair value by an appraisal, 8 *Del. C.* § 262"); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) (following *Sterling*); *Poole v. N.V. Deli Maatschappij*, 243 A.2d 67, 69 (Del. 1968) (affirming Court of Chancery's conclusion that when determining the stock's "true value" for purposes of compensatory damages, "the stock is to be evaluated on a going-concern basis and not on a liquidation basis; that the actual or true [value] of the stock is to be determined by considering the various factors of value including earnings, dividends, market price, assets, and the other factors deemed relevant in a stock evaluation problem arising under . . . 8 *Del. C.* § 262"); *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 342-44 (Del. Ch. 2006) (determining fair value and using that as a basis for damages in breach of fiduciary duty case); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *24 (Del. Ch. June 4, 2004) (finding that "fair value" was $38.05, stating that "[f]rom that fair value finding it further follows that the $10.25 per share merger price was not a 'fair price' within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger*," and granting the difference as damages). *See generally Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 461-64 (Del. Ch. 2011).

21

sometimes colloquially called a "quasi-appraisal" remedy.[9] The quasi-appraisal method provides an appropriate measure of damages for RBC's aiding and abetting liability on both the Sale Process Claim and the Disclosure Claim.[10]

The Liability Opinion did not assign a value to the damages suffered by the Class. That decision adopted as "the general framework for the valuation analysis" the discounted cash flow model presented by plaintiffs' expert, Kevin Dages. Liability Op., 88 A.3d at 107. The Liability Opinion also resolved a series of disputes between Dages and RBC's expert, Thomas Lys, and instructed the parties to submit revised expert

---

[9] *See Weinberger*, 457 A.2d at 714 (coining the term to describe the measure of damages for a breach of fiduciary duty by the controlling stockholder and its representatives on subsidiary board); *Arnold v. Soc'y for Savings Bancorp, Inc.* (*Arnold III*), 1995 WL 376919, *4 (Del. Ch. June 15, 1995) (holding that damages for breach of fiduciary duty could be awarded using a quasi-appraisal remedy), *aff'd*, 678 A.2d 533 (Del. 1996); *In re Ocean Drilling & Exploration Co. S'holders Litig.*, 1991 WL 70028, *7 (Del. Ch. Apr. 30, 1991) (holding that alleged breaches of fiduciary duty did not threaten irreparable harm because the class could be awarded a quasi-appraisal remedy); *Steiner v. Sizzler Rests. Int'l, Inc.*, 1991 WL 40872, at *2 (Del. Ch. Mar. 19, 1991) (Allen, C.) (same).

[10] *See Arnold III*, 1995 WL 376919, at *6 (holding that if defendants were found to have breached their duty of disclosure, "the Court [can] assess damages, calculated through a quasi-appraisal proceeding"); *Wacht v. Cont'l Hosts, Ltd.*, 1994 WL 525222, *4, *7 (Del. Ch. Sept. 16, 1994) (awarding quasi-appraisal damages for breach of the duty of disclosure); *Weinberger v. UOP, Inc.*, 1985 WL 11546, at *9-10 (Del. Ch. Jan. 30, 1985) (awarding quasi-appraisal damages on remand); *see also Berger v. Pubco Corp.*, 976 A.2d 132, 134, 145 (Del. 2009) (awarding compensatory damages measured using quasi-appraisal as remedy for breach of duty of disclosure in short-form merger); *Poole v. N.V. Deli Maatschappij*, 224 A.2d 260, 262, 265 (Del. 1966) (affirming use of "out-of-pocket" damages as measure of damages in challenge to majority stockholder's tender offer involving fraudulent misrepresentations and defining the appropriate "out-of-pocket" measure as "the difference between the price paid for the stock and its true value"). *See generally In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 42-53 (Del. Ch. 2014).

valuations using the inputs that the Liability Opinion identified, along with matrices showing sensitivities, so that the court could consider them when determining damages. *Id.* at 107-109.

Based on the supplemental submissions and the evidence presented at trial, this decision uses a beta of 1.199. The beta calculated as instructed in the Liability Opinion is 1.147, which is lower than the figure advocated by Dages. To avoid awarding value beyond what the plaintiffs sought, this decision uses Dages's beta.

This decision adopts the compromise position of giving equal weight to the supply side and historical equity risk premiums. The Liability Opinion instructed the parties' experts to value the Company using both the historical equity risk premium and the supply side equity risk premium. Dages valued the Company in his report using both a historical equity risk premium of 6.7% and a supply side equity risk premium of 6.0%. Lys valued the Company in his report primarily using the historical equity risk premium of 6.7%, although he conceded that some Delaware decisions have used a supply side equity risk premium, which he calculated to be 6.0%. In *Global GT LP v. Golden Telecom, Inc.*, Chief Justice Strine, writing as a Vice Chancellor, noted that those who militate for supply side equity risk premium "ha[ve] the better of the argument." 993 A.2d 497, 516 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010). He used the supply side equity risk premium of 6% advanced by the appraisal petitioners' expert, as opposed to the historical equity risk premium of 7.1% advanced by the company's expert. *Id.* at 518. Chief Justice Strine noted that the "data [was] far from perfect," but it suggested that the supply side estimate was "much nearer" to the equity risk premium than the historical

estimate. *Id.* In the current case, neither expert argued definitively for the superiority of one estimate over the other. Recognizing that valuation is not a perfect science, this decision takes both into account.

This decision adopts 3.7% as the perpetuity growth rate. Dages and Lys agreed that the perpetuity growth rate should fall between the expected long-term rate of inflation and the expected long-term growth rate of nominal GDP. The experts' reports indicate that the expected long-term rate of inflation at the time of the transaction was approximately 2.1%, and the expected long-term growth rate of nominal GDP was approximately 4.3%. Dages advocated for a perpetuity growth rate equal to the expected long-term growth rate of nominal GDP. Lys used a range of 3.7% to 4.5%. The low end of that range falls comfortably between the expected long-term rate of inflation and the expected long-term growth rate of nominal GDP.

Using a beta of 1.199, giving equal weight to the supply side and historical equity risk premiums, and assuming a perpetuity growth rate of 3.7% yields a quasi-appraisal value for Rural as of the Merger date of $21.42 per share. The members of the Class received $17.25 in the Merger and therefore suffered damages of $4.17 per share. There were 25,380,542 shares of Rural common stock outstanding at the time of the Merger. The members of the Class, which excludes the defendants, Warburg, Coliseum, and their associates and affiliates, held 21,900,133 shares. The amount of damages suffered by the Class as of the date of the Merger was therefore $91,323,554.61.

**B.      Contribution For An Intentional Tort**

Whether the amount of the judgment entered against RBC should be less than the amount of the damages suffered by the Class depends on RBC's ability to claim DUCATA's settlement credit. The plaintiffs contend that because RBC committed an intentional tort, RBC could not have obtained contribution from the Settling Defendants as a matter of law. Therefore, the plaintiffs say, RBC cannot claim DUCATA's settlement credit, and RBC must bear 100% of the damages suffered by the Class. The Delaware Supreme Court has not ruled on whether DUCATA bars contribution for an intentional tort. Pending high court guidance, this opinion concludes that DUCATA does not establish a bright-line rule barring contribution for all intentional torts. A defendant in RBC's situation could seek contribution from other joint tortfeasors, so RBC is not barred from claiming DUCATA's settlement credit.

### 1.      The Plain Language Of DUCATA

Because DUCATA governs this case, the analysis starts there. The plain language of DUCATA does not bar contribution for intentional torts. Section 6302(a) states that "[t]he right of contribution exists among joint tortfeasors" without specifying particular types or categories of tortfeasors. 10 *Del. C.* § 6302(a). Section 6301 defines "joint tortfeasors" as "2 or more persons jointly or severally liable in tort for the same injury to person or property," without limiting the definition to particular types or categories of torts. 10 *Del. C.* § 6301.

"It is well-settled that unambiguous statutes are not subject to judicial interpretation." *Leatherbury v. Greenspun*, 939 A.2d 1284, 1288 (Del. 2007). "If the

25

statute as a whole is unambiguous and there is no reasonable doubt as to the meaning of the words used, the court's role is limited to an application of the literal meaning of those words." *Id.* (internal quotation marks omitted); *accord Friends of the H. Fletcher Brown Mansion v. City of Wilm.*, 34 A.3d 1055, 1059 (Del. 2001). The literal meaning of the words of DUCATA permits contribution among all tortfeasors. The words do not establish a bright-line rule barring contribution for intentional torts. DUCATA therefore permits RBC to seek contribution from other joint tortfeasors and, potentially, to claim the settlement credit.

Because the plain language of DUCATA permits RBC to seek contribution and claim the settlement credit, this decision could reject the plaintiffs' argument against contribution for intentional torts based on the statutory text alone. The plaintiffs, however, have pointed to one Delaware state court decision holding that contribution is not available for intentional torts. *Eastridge v. Thomas*, 1987 WL 9605 (Del. Super. Apr. 13, 1987). They also have cited common law authorities which maintain that contribution is not available for intentional torts. *See, e.g.,* Restatement (Second) § 886A(3) ("There is no right of contribution in favor of any tortfeasor who has intentionally caused the harm."). This decision therefore examines and takes into account other sources of authority on contribution for intentional torts beyond the plain language of DUCATA.[11]

---

[11] There are grounds to debate whether RBC committed what tort scholars would label an intentional tort. Many torts involve a knowing or conscious act, but that level of intentionality can be distinguished from and is less culpable than malicious intent, which involves a specific intent to cause harm or a specific intent to engage in an act that is substantially certain to cause harm. *See generally* W. Page Keeton et al., PROSSER AND

## 2. The Uniform Act of 1939

One place to look for insight into DUCATA is the Uniform Act of 1939, on which DUCATA was based. The Delaware Supreme Court has called on Delaware courts to "give considerable deference to an official commentary written by the statute's drafters and available to the General Assembly before the statutory enactment." *Kallop v. McAllister*, 678 A.2d 526, 530 (Del. 1996); *see Acierno v. Worthy Bros. Pipeline Corp.*,

---

KEETON ON THE LAW OF TORTS § 8 (5th ed. 1984). When tort scholars speak of intentional torts, they mean the latter: "Many intentional acts, such as driving a vehicle, are not tortious in any way at all. . . . [I]ntentionally driving at high speed is . . . not an intentional tort unless the defendant either intends to inflict harm or is certain to do so." Dan B. Dobbs, THE LAW OF TORTS 518 (2001). "[A] jailer may intentionally refuse medical attention, but unless the assertion is that he intended harm or that harm was certain, the claim is one for negligence . . . ." *Id.* n.10 (citing *Del Tufo v. Twp. of Old Bridge*, 685 A.2d 1267 (N.J. 1996)). As noted, the plaintiffs rely on Section 886A(3) of the Restatement (Second) for the proposition that there is no right of contribution among intentional tortfeasors. A close reading of the Restatement (Second) suggests that its rule against contribution applies only to traditional intentional torts where the tortfeasor "has intentionally caused harm to another." *Id.*, cmt. j ("It is not enough for the application of the rule stated in Subsection (3) that the tortfeasor seeking contribution has intentionally violated a statute, as by driving at a speed in excess of the statutory limit or parking next to a fireplug, if his conduct is not intended to do harm to anyone."). The Liability Opinion did not find that RBC acted with malicious intent. It found that RBC aided and abetted a breach of fiduciary duty by knowingly participating in and inducing breaches of duty. In doing so, RBC was not acting with actual intent to harm the Class. Instead, RBC's representatives acted selfishly with the actual intent to extract greater benefits from the transaction for RBC and themselves. I believe they rationalized their self-interested actions by telling themselves that a successful transaction would provide Rural's stockholders with a premium over the pre-announcement market price, so the Class would benefit. At some point, it might have occurred to the sophisticated bankers that Rural and its stockholders could have done better if RBC had not pursued its own interests, and therefore in a larger sense the stockholders were harmed, but I do not believe that RBC acted with the intent to inflict harm. Regardless, because the parties have cast the debate in terms of contribution for an intentional tort, this decision uses that conceptual framework.

656 A.2d 1085, 1090 (Del. 1995) (relying on official commentary to uniform act); *Bell Sports, Inc. v. Yarusso*, 759 A.2d 582, 592 (Del. 2000) (same). The commentary to Section 2 of the Uniform Act of 1939 has this to say about the provision that became Section 6302 of DUCATA:

> This subsection creates the right of contribution among joint tortfeasors. It does not, in any way, qualify the creation of this right by confining it to joint tortfeasors in any narrower sense than that indicated in section 1. Nor does it confine contribution to merely negligent tortfeasors or to those in any way inadvertently harming others. It permits contribution among all tortfeasors whom the injured person could hold liable for the same damage or injury to his person or property.

Uniform Act of 1939, § 2 cmt. The commentary thus stresses and reinforces the absence of any limitation on the torts for which contribution is available.

The drafting history for the Uniform Act of 1939 further supports the absence of a bright-line rule against contribution for intentional torts, while contemplating the existence of judicial authority to deny contribution based on the facts of a particular case. Professor Charles O. Gregory was the Reporter for the Uniform Act of 1939. During a session held to discuss an early draft, one of the participants asked whether its coverage would extend to intentional torts. Professor Gregory stated that the drafters were inclined "to take the view that contribution should be confined to tortfeasors of inadvertence," but found it "utterly impossible to state such a view satisfactorily in statutory form[.]" *Discussion of Contribution Among Tortfeasors Act Tentative Draft No. 1*, 346, 347 (1938). Later in the session, the discussion revisited the issue, and the participants discussed how a definition would account for the range of subclasses of torts, such as those involving moral turpitude, degrees of fault greater than negligence, statutory

28

violations, and vicarious liability. *Id.* at 356-60. One participant expressed concern about the possibility of contribution for acts of violence and posited a scenario involving a mob of 100 people that intentionally destroyed the plaintiff's property. *Id.* at 346. Professor Gregory commented that the hypothetical was "an extreme one and would be very unlikely to arise . . . and if it does, I would be perfectly willing myself to bar contribution there." *Id.* at 347.

During the debates, Professor Gregory referred to his contemporaneous law review article that discussed the difficulty of defining the types of torts for which contribution should be available. *See* Charles O. Gregory, *Contribution Among Tortfeasors: A Uniform Practice*, 1938 Wis. L. Rev. 365 (1938). His article took the position that contribution should not be limited to torts involving negligence, but he stopped short of embracing mandatory contribution for all intentional torts. The following paragraphs illustrate his skepticism about attempting to limit the classes of torts for which contribution is available:

> Statutes in eight jurisdictions permit contribution among tortfeasors without stipulating that the required common liability must rest on negligence or arise out of torts of inadvertence. Nevertheless, courts and writers seem to think that it should be so limited. But then, courts have always been reluctant to offer their assistance to a wrongdoer. They have left such persons where they found them and have not permitted them to base an action "on their own wrong." This stern moral note may be justified in an action for an accounting between highwaymen. It is clearly out of place in actions to spread loss inadvertently inflicted. . . .
>
> There are some practical reasons . . . for not confining contribution to common liability for negligence. In the first place, . . . courts seem unable to agree upon what should be considered as negligence. For instance, breach of a criminal statute is frequently regarded as more reprehensible than "common-law negligence," and a person held liable because of such

breach is therefore denied recovery of contribution. This result is hard to reconcile with the almost universal view that the inadvertent breach of such statutes as a basis of liability for damages is treated as "negligence per se" or evidence of negligence. . . .

Another reason is the emphasis thereby placed on the unfairness of denying contribution in all instances of liability through inadvertence not involving negligence. If contribution is allowed only in negligence cases in order to prevent a "wrongdoer from profiting by his own conscious wrong," it should by parity of reason be permitted whenever common liability arises from torts inadvertently committed, whether they be simple negligence, gross negligence, trespass, libel, conversion, breach of criminal statute, nuisance, or absolute liability.

*Id.* at 366-67 (footnotes omitted).

Having discussed these difficulties, Professor Gregory recommended the approach taken by the Uniform Act of 1939 and DUCATA:

In the interests of practical administrative convenience, if for no other reason, the best proposal is to permit contribution among all tortfeasors commonly liable for the same damage, regardless of the nature of the particular derelictions involved. Such a provision obviates the need of drawing impossible lines between torts of inadvertence and torts involving intent. It eliminates varying personal interpretations of the concept of "moral turpitude." Furthermore, it makes unnecessary nice discrimination between the qualities of the conduct referable to each of two or more tortfeasors who are commonly liable anyway for the same damage. These considerations are extremely important. Heeding them would save our courts from a large amount of troublesome detail and would effect a system of loss distribution with the least possible number of technical legalisms. This system would be understandable and easily applied….

*Id.* at 368 (footnote omitted). Yet despite the broad endorsement of contribution contemplated by this passage, Professor Gregory recognized as a "valid objection" the time-honored principle that "wicked persons should not receive the assistance of the courts." *Id.* To address this concern, he held out the possibility that "if cases do arise . . . in which particular courts feel that it would be shocking to permit contribution, they can

then deny it on the particular facts presented without building up a body of precedent resting on some legal abstraction well-nigh impossible to define." *Id.*

Professor Gregory's comments suggest that the principal drafter of the Uniform Act of 1939, and hence the intellectual father of DUCATA, believed that contribution generally should be available for all torts and that there should not be a bright-line rule excluding contribution for intentional torts. He also seems to have believed that contribution need not automatically be available in every case and that a court could exercise discretion to deny contribution based on the facts. He appears to have thought that denying contribution was most appropriate for conduct intentionally designed to cause physical injury, such as the hypothetical involving mob violence or the seminal precedent of claims between highwaymen addressed in *Merryweather v. Nixan*, 101 Eng. Rep. 1337 (K.B. 1799).

### 3. Other Delaware Statutes That Authorize Contribution

Moving beyond DUCATA and the Uniform Act of 1939, another source of guidance is other Delaware statutes. If the General Assembly has authorized contribution among intentional tortfeasors in other circumstances, then that fact makes it more likely that the General Assembly intended to authorize contribution in such cases generally under DUCATA.

In addition to DUCATA, two Delaware statutes authorize contribution in specific circumstances. Both encompass acts involving degrees of intent greater than negligence. The first statute is Section 174 of the DGCL. 8 *Del. C.* § 174. It provides that "[i]n case of any willful or negligent violation § 160 or § 173 . . . the directors under whose

31

administration the same may happen shall be jointly and severally liable . . . to the full amount of the dividend unlawfully paid" or for the amount of stock unlawfully purchased or redeemed. *Id.* § 174(a). It then states that "[a]ny director against whom a claim is successfully asserted under this section shall be entitled to contribution from the other directors who voted for or concurred in the unlawful dividend, stock purchase or stock redemption." *Id.* § 174(b). Section 173 of the DGCL limits when a corporation may pay dividends. *Id.* § 173. Section 160(a)(1) extends the limitations on the payment of dividends to stock redemptions, and Sections 160(a)(2) and (3) impose other restrictions on the corporations' ability to purchase its own shares. *Id.* § 160. For directors to violate these sections necessarily involves a conscious act: they must declare the dividend or authorize the stock redemption. Section 174(a) recognizes that the violation could be "willful." Nevertheless, Section 174(b) authorizes a director who has been held liable to seek contribution.

The second statute is Delaware's Blue Sky Law. Section 73-605(a) imposes civil liability on persons who buy or sell securities in violation of particular sections of the act. 6 *Del. C.* § 73-605(a). Section 73-605(b) imposes joint and several liability on

> [e]very person who directly or indirectly controls a seller or buyer liable under subsection (a) of this section, every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such seller or buyer who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale . . . to the same extent as the seller or buyer, unless the nonseller or nonbuyer who is so liable sustains the burden of proof that the person did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

32

6 *Del. C.* § 73-605(b). The statute provides for contribution, stating: "There is contribution as in cases of contract among the several persons so liable." *Id.* Under the terms of Section 73-605(b), for joint and several liability to exist, the nonseller or nonbuyer at least must have known about the violation, acted knowingly, or had reason to know of the facts giving rise to liability. This standard contemplates imposing liability for a mental state greater than simple negligence, yet Section 73-605(b) authorizes contribution.

For the General Assembly to have authorized contribution for wrongs involving conscious acts under Section 174 of the DGCL and Delaware's Blue Sky Law suggests that it is not contrary to Delaware law to permit contribution under such circumstances. The existence of these statutes is consistent with the plain language of DUCATA, which authorizes contribution generally and does not exclude torts where the tortfeasor acted with a state of mind more culpable than negligence.

### 4. Cases Addressing The Availability Of Contribution For Intentional Torts Under Delaware Law

Turning to case law, *Eastridge* is the only Delaware state court decision to have addressed contribution for an intentional tort, but that opinion did not mention or discuss DUCATA. Three federal court decisions have considered the issue, reaching opposing conclusions. One decision pre-dated *Eastridge*, applied DUCATA, and permitted contribution. *McLean v. Alexander (McLean II)*, 449 F. Supp. 1251 (D. Del. 1978), *rev'd on other grounds*, 599 F.2d 1190 (3d Cir. 1979). The other two decisions post-dated *Eastridge* and interpreted that decision as foreclosing contribution. *380544 Can., Inc. v.*

33

*Aspen Tech., Inc.*, 544 F. Supp. 2d 199 (S.D.N.Y. 2008); *Hollinger Int'l, Inc. v. Hollinger*, 2006 WL 1444916 (N.D. Ill. Jan. 25, 2006). In my view, *McLean II* provides the most persuasive analysis and is closest to the facts of this case.

The earliest decision was *McLean II*, which involved a suit by the acquirer of a closely held company against the selling stockholders, the sellers' investment banker, and the sellers' accountant and his firm for securities fraud and common law fraud. Everyone settled except for the accountant and his firm, who were found liable after trial on both theories. *McLean v. Alexander (McLean I)*, 420 F. Supp. 1057 (D. Del. 1976). The accountant and his firm then sought to have the amount of any judgment against them reduced by the portion of liability attributable to the settling defendants. *McLean II*, 449 F.Supp at 1255-56. Judge Murray M. Schwartz held that the selling stockholders who were active in management would have been liable to the plaintiff but for the settlement. *Id.* at 1260. He held that the investment bank would not have been liable to the plaintiff. *Id.* at 1261-62. After reviewing a wide range of authorities, Judge Schwartz concluded that "all wrongdoers may properly share in the apportionment of damages via claims for contribution." *Id.* at 1267. He construed DUCATA to authorize contribution, reasoning that "there is no limitation expressed within the terms of the statute," and he interpreted Professor Gregory's writings to show that "[c]ommentators writing at the time of its passage understood the statute to apply to intentional wrongdoing as well as non-intentional torts." *Id.* at 1275. Applying principles of relative fault, Judge Schwartz assessed 10% fault to the accountant and his firm and 90% to the culpable shareholders who settled. *Id.* at 1277. On appeal, the result in *McLean II* was reversed on other

34

grounds: the Court of Appeals found the evidence of *scienter* insufficient to establish liability on the party of the accountant and his firm. *McLean v. Alexander*, 559 F.2d 1190, 1199 (3d Cir. 1977). The Court of Appeals had "no occasion to discuss the method by which contribution and indemnity were calculated." *Id.* at 1201.

Next came *Eastridge*, a case that involved very different facts. The plaintiff (Eastridge) sued the defendant (Thomas) for injuries suffered when Thomas intentionally struck Eastridge in the face with a beer bottle. Eastridge also sued the owner of the bar where the incident took place, alleging that the bar owner acted negligently or willfully and wantonly by serving alcohol to Thomas after he was obviously intoxicated. Thomas cross-claimed for contribution from the bar owner, claiming that the bar owner had a duty to control his patrons and that a breach of this duty proximately caused Thomas to assault the plaintiff with the beer bottle. The Delaware Superior Court granted summary judgment in favor of the bar owner:

> It is an elementary [tenet] of the law of indemnity and contribution that such a cause of action will not arise for an unlawful or illegal act by a party, not expressly approved or authorized by the party against whom relief is sought. See 41 Am. Jur. 2d, Indemnity, §§ 11, 19 et. seq. and 18 Am. Jur. 2d, Contribution §§ 35, 37 et seq. Thus, in a case such as this where the act complained of is an intentional tort by Thomas, no contribution or indemnification will lie.

1987 WL 9605, at *2. While the *Eastridge* decision appeared to state broadly that "where the act complained of is an intentional tort . . ., no contribution or indemnification will lie," the facts of the case involved the intentional infliction of physical harm. It therefore resembled the situations where Professor Gregory indicated that he would not

contemplate a right of contribution. Notably, *Eastridge* did not consider DUCATA or *McLean II*.

After *Eastridge*, two federal district courts followed that decision in denying contribution on facts more closely resembling *McLean II*. In *Aspen*, the defendants were corporate officers who had been sued for securities fraud, common law fraud, and breach of fiduciary duty. They sought contribution under DUCATA from other corporate officers. The district court dismissed their contribution claim:

> As the defendants correctly observe, it is a tenet of common tort law that "courts will not aid one who has deliberately done harm." Restat. (2d) Torts § 886A(3), cmt. j. The claims for which [the officers] seek contribution stem entirely from allegations of [the officers'] intentionally wrongful conduct. [The officers] are alleged to have intentionally withheld information about the Yukos transaction from their employer and used the undisclosed information for their benefit by attempting to extort Aspen's Board of Directors into furnishing cash for its disclosure. Whether styled as fraud or breach of fiduciary duty, this is intentional and willful conduct. Construing Delaware's contribution law in light of the state court's holding in *Eastridge* and the well-settled common law prohibition against permitting a tortfeasor to seek contribution on alleged intentionally tortious conduct, I find that Plaintiffs are barred from seeking contribution from the Individual Defendants on Aspen's Counterclaim.

*Aspen*, 544 Supp. 2d. at 234. The *Aspen* court declined to follow *McLean II* because it pre-dated *Eastridge*. *Id*. The *Aspen* court did not consider the factual distinctions between the cases.

In the other federal decision, *Hollinger*, the district court stated simply that "[a]lthough it appears that under Delaware law contribution may be sought for a breach of fiduciary duty, it may not be sought for an intentional tort." 2006 WL 1444916, at *2. As support, the court cited *Eastridge*, which it treated as authoritative.

36

*McLean II* and *Eastridge* can be harmonized by recognizing that *Eastridge* involved a tortfeasor who consciously intended to cause physical harm, bringing it within Professor Gregory's paradigmatic case for denying contribution. In *McLean II*, Judge Schwartz applied DUCATA and permitted contribution by wrongdoers who committed an intentional act (securities fraud), but under circumstances similar to situations where Delaware's Blue Sky Law and Section 174 of the DGCL would authorize contribution. In my view, the *Aspen* and *Hollinger* decisions read *Eastridge* too broadly as ostensibly establishing a bright-line rule against contribution for all intentional torts. In this case, the acts in which RBC engaged reflect a level of culpability similar to the conduct in *McLean II*, which supports RBC's ability to claim the settlement credit under DUCATA.

### 5.       Contribution In Other States

Because DUCATA is based on a uniform act, it is natural to ask how other states have approached the question of contribution for intentional torts. Unfortunately, other states have reached diverse results that make it difficult to draw helpful lessons. "The approaches that the states take to [contribution] are remarkably fragmented. . . . Not only are the uniform laws inconsistent with each other, but inconsistent applications of identical provisions exist among states adopting the same uniform act." Jean Macchiaroli Eggen, *Understanding State Contribution Laws and Their Effect on the Settlement of Mass Torts*, 73 Tex. L. Rev 1701, 1701-02 (1995) (footnotes omitted).

DUCATA is based on the Uniform Act of 1939, but that act fell well short of uniformity. Only Arkansas, Delaware, Hawaii, Maryland, New Mexico, Pennsylvania, Rhode Island, and South Dakota adopted and currently adhere to it. Restatement (Third)

37

§ 23 Reporters' Note cmt. a. The state courts in the seven jurisdictions other than Delaware do not appear to have addressed whether an intentional tortfeasor can seek contribution under their versions of the Uniform Act of 1939. Consistent with the analysis in this opinion, two federal decisions have predicted that Rhode Island would not draw any distinction for purposes of contribution among types of tortfeasors because of the plain language of its version of the Uniform Act of 1939. *See N. Atl. Fishing, Inc. v. Geremia*, 153 B.R. 607, 612 (D.R.I. 1993); *Testa v. Winquist*, 451 F.Supp. 388, 393 (D.R.I. 1978). Yet federal courts have predicted that Hawaii and Pennsylvania would draw a distinction between types of tortfeasors and would not permit intentional tortfeasors to seek contribution, premised largely on the traditional common law rule against it. *See Beavers v. W. Penn Power Co.*, 436 F.2d 869, 875 (3d Cir. 1971) (Pennsylvania law); *Whirlpool Corp. v. CIT Gp./Bus. Credit., Inc.*, 293 F.Supp.2d 1144, 1150 (D. Haw. 2003) (Hawaii law); *In re One Meridian Plaza Fire Litig.*, 820 F.Supp. 1492, 1496 (E.D. Pa. 1993) (Pennsylvania law).

Eleven jurisdictions have adopted the revised Uniform Contribution Among Tortfeasors Act of 1955. *See* Restatement (Third) § 23 Reports' Note cmt. a (listing Arizona, Colorado, Florida, Massachusetts, Nevada, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, and Tennessee). The Uniform Act of 1955 contains a provision barring contribution for intentional torts and recommends extending the bar to torts involving willful or wanton conduct. *See* Uniform Act of 1955 § 1(c) ("There is no right of contribution in favor of any tortfeasor who has intentionally [willfully or wantonly] caused or contributed to the injury or wrongful death."). The Uniform Act of

1955 also states that it "shall not apply to breaches of trust or other fiduciary obligation." *Id.* § 1(g); *see* Laster & Morris, *supra*, at 83-85 (discussing historical development of Uniform Act of 1955 and reasons for excluding breaches of fiduciary duty). Notably, Delaware did not adopt the 1955 revision: "Delaware's statute was not modified after the 1955 Revision was promulgated. Hence, the language changes of the 1955 Revision do not affect the Delaware law." *Clark v. Brooks*, 377 A.2d at 372.

Fifteen states have contribution statutes that are not based on a uniform act. *See* Restatement (Third) § 23 Reports' Note cmt. a (listing Connecticut, Idaho, Illinois, Georgia, Kentucky, Louisiana, Michigan, Mississippi, Montana, New Hampshire, New Jersey, New York, Oregon, Virginia, and Wisconsin). Four states have contribution statutes which, like DUCATA, do not make distinctions among types of tortfeasors. New York's contribution statute provides that "two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them," N.Y. C.P.L.R. 1401 (McKinney), and the New York Court of Appeals held that the statute applies to all tortfeasors, regardless of their degree of intent, *Bd. of Educ. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 27 (1987). New Jersey's statute provides that "[t]he right of contribution exists among joint tortfeasors" and defines joint tortfeasors as "two or more persons jointly or severally liable in tort," N.J.S.A. 2A:53A-1 to 53A-2, and the New Jersey Supreme Court held that the act permits contribution among all tortfeasors, regardless of their degree of intent, *Judson v. Peoples Bank & Trust Co.*, 17 N.J. 67, 91 (1954). The Michigan statute is similar, and the Michigan Supreme Court reached the same result. *See* Mich. Comp.

39

Laws Ann. § 600.2925a(1); *Donajkowski v. Alpena Power Co.*, 460 Mich. 243, 252 (1999). By contrast, the Illinois Supreme Court held that a comparable definition which did not distinguish among tortfeasors was ambiguous, then relied on legislative history to hold that the statute excluded contribution for intentional torts. *Gerill Corp. v. Jack L. Hargrove Builders*, 128 Ill.2d 179, 206 (1989). The state courts of Georgia, Idaho, Mississippi, Montana, New Hampshire, and Oregon do not appear to have addressed the issue.

Six of the non-uniform act states have statutes that foreclose the possibility of contribution for intentional torts by limiting contribution to judgment debtors. Restatement (Third) § 23 Reports' Note cmt. a (listing California, Kansas, Minnesota, Missouri, Texas, and West Virginia). The Virginia and Kentucky statutes foreclose the possibility by limiting contribution to torts resulting from negligence and not involving moral turpitude. Va. Code § 8.01-34; K.R.S. § 412.030.

Iowa and Washington have recognized contribution by adopting the Uniform Comparative Fault Act. *See* Restatement (Third) § 23 Reports' Note cmt. a. The official comment to the Uniform Comparative Fault Act states that its coverage does extend to intentional torts. Unif. Comparative Fault Act § 1, cmt. States that continue to recognize contribution as a matter of common law follow the historical rule of denying contribution to intentional tortfeasors. *Preferred Accident Ins. v. Musante, Berman & Steinberg*, 133 Conn. 536, 541 (1947); *Bedard v. Greene*, 409 A.2d 676, 677-78 (Me. 1979); *Royal Indem. Co. v. Aetna Cas. & Sur. Co.*, 229 N.W.2d 183, 189 (Neb. 1975); *Ellis v. Chi. & Nw. Ry. Co.*, 167 N.W. 1048, 1053-54 (Wisc. 1918).

Given the diversity of positions in other jurisdictions, it is hard to draw meaningful insights for purposes of this case. At the risk of overgeneralization, there appears to be a growing trend away from bright-line, all-or-nothing rules and towards concepts of relative fault and the allocation of responsibility among parties, including parties who have committed intentional torts. This trend includes movement towards permitting joint tortfeasors who have acted with a more culpable state of mind than negligence to seek contribution, although jurisdictions that permit contribution for intentional torts appear still to be in the minority.[12] Most persuasive for present purposes are decisions from states with statutes which, like DUCATA, do not differentiate among classes of torts. Applying their respective statutes, the highest courts in New Jersey, New York, and Michigan have interpreted the lack of a distinction among classes of torts to authorize

---

[12] *See* J. Tayler Fox, *Note: Can Apples Be Compared To Oranges? A Policy-Based Approach For Deciding Whether Intentional Torts Should Be Including In Comparative Fault Analysis*, 43 Val. U. L. Rev. 261, 270-286 (2008) (describing trends); Ellen M. Bublick, *The End Game of Tort Reform: Comparative Apportionment and Intentional Torts*, 78 Notre Dame L. Rev. 355, 357 (2003) (noting that "a significant number of state courts and legislatures are permitting liability to be apportioned between some types of intentional and negligent fault"); *id.* at 364-71 (describing trends). A prominent illustration of the trend is the Restatement (Third), which does not distinguish among types of torts when discussing contribution. It states as the general rule, "[w]hen two or more persons are or may be liable for the same harm and one of them discharges the liability of another by settlement or discharge of judgment, the person discharging the liability is entitled to recover contribution from the other, unless the other previously had a valid settlement and release from the plaintiff." Restatement (Third) § 23(a). A comment on this section entitled "Intentional Torts" states that "[a] person who can otherwise recover contribution is not precluded from receiving contribution by the fact that he is liable for an intentional tort." *Id.* cmt. *l.*

intentional tortfeasors to seek contribution. These precedents support interpreting DUCATA to permit RBC to claim the settlement credit.

### 6. Federal Law

A final place to look for guidance on contribution for intentional torts is federal law. It turns out that federal contribution decisions often involve state law claims where the federal court exercised diversity jurisdiction, so the opinions apply state law under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), and are properly treated as part of the state law jumble. With those cases set aside, the federal authorities present much the same picture as the Delaware authorities. They do not suggest a bright-line rule against contribution for all intentional torts, and they support the availability of contribution among joint tortfeasors when the tortious conduct involves a level of culpability similar to the acts in which RBC engaged.

The most instructive authorities involve contribution under the federal securities laws.[13] Federal statutes have long provided for contribution among joint tortfeasors who acted with *scienter. See* 15 U.S.C. § 77k(f); 15 U.S.C. §§ 78i(f) & 78r(b). Building on those statutory provisions, the United States Supreme Court recognized a common law

---

[13] An extensive body of scholarship focuses on these issues. *See, e.g.,* Marc I. Steinberg & Christopher D. Olive, *Contribution and Proportionate Liability Under The Federal Securities Laws In Multidefendant Securities Litigation After The Private Securities Litigation Reform Act of 1995*, 50 SMU L. Rev. 337 (1996); Vincent P. Liberti, *Joint & Several Liability Under Rule 10b-5: The Apportionment of Liability for Contribution Claims Involving Non-Settling Defendants*, 7 DePaul Bus. L.J. 45 (1994); Phillip M. Nichols, *Symmetry and Consistency and the Plaintiff's Risk: Partial Settlement and the Right of Contribution in Federal Securities Actions*, 10 Del. J. Corp. L. 1 (1994).

right of contribution among joint tortfeasors found liable under Rule 10b-5. *Musick, Peller & Garrett v. Emp'rs Ins. Of Wasau*, 508 U.S. 286, 288 (1993). A right to contribution among joint tortfeasors who "knowingly committed" a violation of the Securities and Exchange Act was codified by the Private Securities Litigation Reform Act of 1995, which contemplates allocation of liability among jointly and severally liable defendants based on their percentage of responsibility. 15 U.S.C. § 78u-4(f)(8).

These authorities support permitting RBC to seek contribution from its fellow joint tortfeasors. Under the federal securities laws, defendants who acted with *scienter* can seek contribution. The fact that these defendants engaged in knowing or intentional acts does not operate as a bright-line bar to contribution. Similar principles should apply to RBC, which engaged in conduct comparable in culpability to a violation of the federal securities laws.

### 7.    Application To This Case

Based on the foregoing authorities, it does not appear that a bright-line rule exists that would bar RBC from claiming DUCATA's settlement credit. To reiterate, DUCATA does not contain any language that would limit a contribution claim by RBC. The drafting history of the Uniform Act of 1939 suggests that Professor Gregory expected contribution to be broadly available, and statutes like Sections 174 of the DGCL and Delaware's Blue Sky Law contemplate contribution in similar situations. Although *Eastridge* and *McLean II* point in different directions, *Eastridge* did not consider DUCATA and involved conduct similar to Professor Gregory's paradigmatic case for denying contribution. Judge Schwartz's decision in *McLean II* addressed contribution

43

under DUCATA and is closer to the facts of this case. This decision therefore adheres to the plain language of DUCATA and holds that RBC is not barred from claiming a settlement credit because RBC knowingly participated in the individual defendants' breach.

## C. Equitable Defenses

For the reasons discussed in the preceding section, DUCATA does not establish a bright-line rule that bars a defendant who has acted with a mental state more culpable than negligence from seeking contribution. Nevertheless, as Professor Gregory envisioned, a court retains discretion to deny contribution under DUCATA if warranted by the facts of the case. *Farrall v. A.C. & S. Co., Inc.*, 586 A.2d 662, 664 (Del. Super. 1990). Equitable considerations can provide a discretionary basis for a court to deny contribution, because DUCATA "was intended to apply equitable considerations in the relationships of injured parties and tortfeasors." *Id.* In this case, the plaintiffs argue that the doctrines of *in pari delicto* and unclean hands should bar RBC from receiving a settlement credit. This decision holds that *in pari delicto* does not apply, but that unclean hands bars RBC from claiming the settlement credit for the Disclosure Claim and for the Sale Process Claim to the extent that the breaches of duty related to the Board's final approval of the Merger.

"Delaware, like most American jurisdictions and our federal common law (where applicable), embraces to some extent the venerable *in pari delicto* doctrine." *In re Am. Int'l Grp., Inc., Consol. Deriv. Litig. (AIG II)*, 976 A.2d 872, 882 (Del. Ch. 2009) (Strine, V.C.). The doctrine provides that courts "will not extend aid to either of the parties to a

44

criminal act or listen to their complaints against each other but will leave them where their own act has placed them." *Id.* (quoting 1 Am.Jur.2d Actions § 40); *accord In re LJM2 Co-Inv., LP*, 866 A.2d 762, 775 (Del. Ch. 2004) ("[U]nder the *in pari delicto* doctrine, a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in." (internal quotation marks omitted)). The doctrine does not apply here because RBC did not engage in criminal or illegal conduct. RBC committed a tort by participating knowingly in tortious acts. Some tortious acts rise to the level of criminal acts. RBC's did not.

> Delaware law also recognizes the doctrine of unclean hands. This doctrine
>
> is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case. The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name. In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which [the litigant] appeals.

*Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 522 (Del. Ch. 1998). "[T]he purpose of the [doctrine] is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit." *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976). "[C]ourts of equity have extraordinarily broad discretion in application of the [unclean hands] doctrine." *Nakahara*, 718 A.2d at 522. Courts "are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Id.* (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245-46 (1933)).

"Fraud will typically suffice to hold a party ineligible for relief under the unclean hands doctrine." *Healy v. Healy*, 2006 WL 3289623, at *2 (Del. Ch. Oct. 31, 2006).

In my view, when considering whether the unclean hands doctrine limits RBC's ability to claim the settlement credit, the relevant focus should be on RBC's conduct *vis-à-vis* the other alleged joint tortfeasors, not on RBC's conduct *vis-à-vis* the Class. This is because for the unclean hands doctrine to apply, "the inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought." *Nakahara*, 718 A.2d at 523 (internal quotation marks in original). "The doctrine of 'unclean hands' provides that 'a litigant who engages in reprehensible conduct *in relation to the matter in controversy* . . . forfeits his right to have the court hear his claim, regardless of its merit." *Portnoy v. Cyro-Cell Int'l, Inc.*, 940 A.2d 43, 80-81 (Del. Ch. 2008) (Strine, V.C.) (internal citation omitted; emphasis added). The court is not an "avenger[] of wrongs committed at large . . . Thus to trigger the unclean-hands doctrine, the inequitable conduct of the party seeking relief must be directly related to the matter before the court." Donald J. Wolfe, Jr. & Michael A. Pittenger, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY 11.07(c) (2013) (emphasis added). "The maxim does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern." 27A Am. Jur. 2d Equity § 104. In an ordinary, bilateral case, "[t]he traditional defense of unclean hands applies to facts involving only two parties, plaintiff and defendant, and one transaction involving both parties." *Id.* Once the focus shifts to the issue of contribution, the defense of unclean

46

hands looks to the facts involving the contribution plaintiff (RBC) and the contribution defendants (the other joint tortfeasors).

The availability of contribution for violations of the securities laws is consistent with focusing on conduct among the defendants when applying the defense of unclean hands. As discussed in the preceding section, contribution is generally available under the federal securities laws and Delaware's Blue Sky Law, even among wrongdoers who acted with *scienter*. *See* 15 U.S.C. §§ 77k(f), 78i(f), 78r(b), 78u-4(f)(8) & 78u-4(f)(2)(A); 6 *Del. C.* § 73-605(b). If unclean hands barred contribution among defendants whenever they acted fraudulently towards a plaintiff, the equitable doctrine would override the statutory authorization of contribution. There is no tension if the unclean hands doctrine examines conduct among the defendants themselves when assessing the availability of contribution.

In this case, the doctrine of unclean hands bars RBC from claiming the settlement credit to the extent RBC perpetrated what the Delaware Supreme Court has described as a "fraud upon the board*." Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1988). "In colloquial terms, a fraud on the board has long been a fiduciary violation under our law and typically involves the failure of insiders to come clean to the independent directors about their own wrongdoing, the wrongdoing of other insiders, or information that the insiders fear will be used by the independent directors to take actions contrary to the insiders' wishes." *In re Am. Int'l Gp., Inc. Consol. Deriv. Litig.* (*AIG I*), 965 A.2d 763, 806-07 (Del. Ch. 2009) (Strine, V.C.). In *Macmillan*, the Delaware Supreme Court took pains to note that the concept of a "fraud on the board" extends to

47

advisors, such as the investment bank in that case who joined with two senior officers in withholding information from the board: "[I]t is bedrock law that the conduct of one who knowingly joins with a fiduciary, including corporate officials, in breaching a fiduciary obligation is equally culpable." 559 A.2d at 1284 n. 33.

The Liability Opinion imposed liability on RBC for both the Sale Process Claim and the Disclosure Claim. As to the latter, the Liability Opinion found that RBC provided false information to the Board in its financial presentation. Liability Op., 88 A.3d at 104. As to the former, the Liability Opinion identified two breaches of duty, one of which occurred during the final approval of the Merger. During this period, the Board failed to provide "active and direct oversight" of RBC, did not detect its "last minute efforts to solicit a buy-side financing role from Warburg," and did not identify the manipulation of RBC's financial analyses or the false justifications proffered for certain changes. *Id*. at 94. Each instance involved a fraud on the Board. The Disclosure Claim involved affirmative misrepresentations. The Sale Process Claim involved both affirmative misrepresentations and failures to disclose. The directors breached their duties when approving the disclosures in the Proxy Statement and when approving the Merger, but they did so because RBC misled them, affirmatively in the case of the Disclosure Claim and both affirmatively and by omission during the final approval of the Merger. If RBC were permitted to seek contribution for these claims from the directors, then RBC would be taking advantage of the targets of its own misconduct. This is a circumstance where the unclean hands doctrine should apply.

The backdrop of Section 141(e) plays a role in assessing the equities for purposes

48

of applying the unclean hands doctrine. Section 141(e) states that

> [a] member of the board of directors . . . shall, in the performance of such member's duties, be fully protected in relying in good faith . . . upon such information, opinions, reports or statements presented . . . by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care[.]

8 *Del. C.* § 141(e). Directors may breach their duties and yet be "fully protected" under Section 141(e) if they reasonably rely on advisors. It would run contrary to the full protection contemplated by Section 141(e) if RBC could assert a claim for contribution back against the directors who relied on the false and materially incomplete information that RBC provided.[14]

Because of its unclean hands, RBC cannot claim a settlement credit for the Disclosure Claim or for the aspect of the Sale Process Claim relating to the final approval of the Merger. RBC forfeited its right to have a court consider contribution for these matters by committing fraud against the very directors from whom RBC would seek contribution. By contrast, RBC can claim a settlement credit for the aspect of the Sale Process Claim that did not involve misrepresentations and omissions by RBC towards its fellow defendants.[15]

---

[14] Section 141(e) could be introduced at a later stage of the analysis to achieve the same result. The full protection offered by Section 141(e) is a defense to liability. Like exculpation under Section 102(b)(7), it can defeat the requirement under DUCATA that the party from whom contribution is sought be jointly liable in tort with the contribution plaintiff. *See* Part II.E.1, *infra*.

[15] Reasonable minds can differ about whether permitting a defendant like RBC to obtain contribution or, in this case, a settlement credit undermines the policy goal of

deterring tortious conduct. Some posit that foreclosing contribution deters wrongdoing more effectively because of a lottery effect in which a single tortfeasor could be forced to bear the entire amount of the plaintiff's loss. *See, e.g.*, *Tex. Indus., Inc. v. Radcliff Mat'ls, Inc.*, 451 U.S. 630, 636 (1981) (noting that "[r]espondents and amici opposing contribution point out that an even stronger deterrent may exist in the possibility, even if more remote, that a single participant could be held fully liable for the total amount of the judgment. In this view, each prospective co-conspirator would ponder long and hard before engaging in what may be called a game of 'Russian roulette'"); *AIG II*, 976 A.2d at 882 n.21 (citing deterrence when applying doctrine of *in pari delicto*); *Morente v. Morente*, 2000 WL 264329, *3 (Del. Ch. Feb. 29, 2000) (Strine, V.C.) (citing deterrence when applying doctrine of unclean hands); Jake Dear & Steven E. Zipperstein, *Comparative Fault and Intentional Torts: Doctrinal Barriers and Policy Considerations*, 24 Santa Clara L. Rev. 1, 18 (1984) (citing as a policy justification for denying contribution in the case of intentional torts that "by treating an intentionally acting tortfeasor more harshly than his negligent counterpart, future conduct will be deterred"). Others contend that allowing contribution deters more effectively by increasing the probability that each tortfeasor will bear at least some of the loss. *See, e.g.*, *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 88 (1981) ("[I]t is sound policy to deter all wrongdoers by reducing the likelihood that any will entirely escape liability.") (citing W. Prosser, Law of Torts § 50, pp. 305–306 (4th ed. 1971)); *Blazovic v. Andrich*, 590 A.2d 222, 231 (N.J. 1991) ("Apportionment of fault between intentional and negligent parties will not eliminate the deterrent or punitive aspects of tort recovery."); *Judson*, 110 A.2d at 34 ("[I]f each intentional wrongdoer knew that his conduct was exposing him to the risk of the certainty of liability in some amount, the desired deterrent effect would be produced more surely than if contribution among the wrongdoers is denied."). Under the latter view, extending contribution is consistent with the general trend towards comparative fault, which scholars now regard as more efficient than all-or-nothing fault-based regimes. Andrew R. Klein, *Comparative Fault and Fraud*, 48 Ariz. L. Rev. 983, 997-99 (2006); *see, e.g.*, Daniel H. Cole & Peter Z. Grossman, PRINCIPLES OF LAW AND ECONOMICS 222 (Prentice Hall 2005) (stating that "comparative negligence is arguably superior, from the perspective of economic efficiency, to other fault-based tort regimes that treat cost allocation as an all or nothing proposition"); Oren Bar-Gill & Omri Ben-Shahar, *The Uneasy Case for Comparative Negligence*, 5 Am. L. & Econ. Rev. 433, 434 (2003) (stating that scholars have demonstrated that comparative fault necessarily leads to efficient outcomes in models that do not consider the possibility of judicial error and that scholars are actively debating the question of which system is most efficient when considering incomplete information). Empirical research supports the broader proposition that increasing the certainty of punishment advances the goal of deterrence by a greater margin than a proportional increase in the magnitude of the penalty. *See, e.g.*, Daniel Nagin, *Deterrence in the 21st Century: A Review of the Evidence*, *in* CRIME AND JUSTICE: AN ANNUAL REVIEW OF RESEARCH (M. Tonry, ed.,

**D.      The Statutory Requirements For The Settlement Credit**

Having determined that RBC is not barred entirely from claiming DUCATA's settlement credit on statutory or equitable grounds, this decision must consider whether RBC has met the requirements for the credit. The plaintiffs contend that RBC has not proven that any of the Settling Defendants were joint tortfeasors, making the settlement credit unavailable. RBC counters that the findings in the Liability Opinion establish that the Settling Defendants were joint tortfeasors. This decision holds that (i) RBC had the burden to establish that the Settling Defendants were joint tortfeasors, (ii) RBC did not waive its right to contend that the Settling Defendants were joint tortfeasors, (iii) the Settlement did not dispose of the need to determine whether the Settling Defendants were joint tortfeasors, (iv) the agreements in principle and the Settlement did not prejudice RBC.

DUCATA only recognizes a right of contribution among joint tortfeasors. 10 *Del. C.* § 6302(a) ("The right of contribution exists among joint tortfeasors."). The statute defines joint tortfeasor status in terms of common liability for money damages. *Id* § 6301

2013) ("[C]ertainty of apprehension, not the severity of the ensuing legal consequence, is the more effective deterrent."); Horst Entorf, *Certainty and Severity of Sanctions in Classical and Behavioral Models of Deterrence: A Survey* (Institute for the Study of Labor (IZA), Discussion Paper No. 6516, 2012), available at http://ftp.iza.org/dp6516.pdf (noting that many new surveys "confirm what has been found by earlier studies, i.e. that the deterrent effect of the certainty of sanctions far outweighs the severity of punishment."). In my view, DUCATA resolves the general policy debate in favor of contribution, and the plaintiffs have not provided case-specific reasons for reaching a different conclusion about deterrence that would warrant applying the doctrine of unclean hands to RBC.

("defining "joint tortfeasors" as "2 or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them.""); *id* § 6302(b) (recognizing a right of contribution only when one joint tortfeasor has paid more than its proportionate share of "the common liability"). The statutory focus on common liability departed from the common law rule, which recognized joint tortfeasor status "where there existed joint or concurring negligence." *Clark v. Brooks*, 377 A.2d at 368.

Delaware decisions have interpreted DUCATA's definition of "joint tortfeasor" to require that the party seeking contribution show that the proposed contributor could have "common liability"—in the sense of an obligation to pay money damages—for the injury to the plaintiff. In the first decision to address the issue, the Delaware Superior Court held that "[i]t is clear from the very language of the statute itself that it has no application unless there is a 'common liability' to the injured person. . . . [T]here is no right to contribution unless the injured person has a possible remedy against two or more persons." *Lutz*, 100 A.2d at 648. The Delaware Supreme Court has explained that DUCATA "comes into play only when the proposed contributor shares with the defendant a 'common liability' to the plaintiff. Absent such liability, no contribution may be enforced." *Fields v. Synthetic Ropes, Inc.*, 215 A.2d 427, 430 (Del. 1965). "Common liability, not concurring negligence, is the *sine qua non* for the invocation of the Uniform

Contribution Act." *Ferguson v. Davis*, 102 A.2d 707, 708 (Del. Super. 1954). Numerous

decisions recognize and apply these principles.[16]

The requirement of joint tortfeasor status has significant implications for the

settlement credit. The Delaware Supreme Court has held that "[t]he credit provided for in

the Delaware Uniform Contribution Law is applicable exclusively to 'joint tortfeasors.'"

*Med. Ctr. of Del., Inc. v. Mullins*, 637 A.2d 6, 8 (Del. 1994). Consequently, the joint

tortfeasor status of the party receiving the release is "a prerequisite to claiming the

---

[16] *See, e.g., Youell v. Maddox*, 692 F. Supp. 343, 350 (D. Del. 1988) ("In order for an action for contribution to lie, however, the joint tortfeasors must share a 'common liability' to the injured party."); *ICI Am., Inc. v. Martin-Marietta Corp.*, 368 F. Supp. 1148, 1151 (D. Del. 1974) ("Indispensible to a joint tortfeasor relationship [under DUCATA] is a 'common liability' either 'joint' or 'several' that two or more parties have to the person injured. Without this dual liability . . ., no right of contribution can exist."); *Walker v. Patterson*, 325 F. Supp. 1024, 1026 (D. Del. 1971) ("[I]t is clear that under Delaware law there can be no contribution unless there is a common liability to the injured person and unless the injured person has a possible remedy against two or more persons."); *Builders & Managers, Inc. v. Dryvit Sys., Inc.*, 2004 WL 304357, *2 (Del. Ch. Feb. 13, 2004) ("The inherent requirement is that the parties are joint tortfeasors who share a 'common liability.'"); *Pringle v. Scarberry*, 1981 WL 383062, *1 (Del. Super. Aug. 12, 1981) ("[It] is clear from the very language of the statute, itself, that it has no application unless there is a common liability to the injured party. . . . [T]here is no right to contribution unless the injured person has a remedy against two or more persons."); *see also Clark v. Brooks*, 391 A.2d at 748 (holding that the party seeking contribution and the proposed contributor must be "at least 'severally' liable for the same injury to plaintiff"). Courts in the other states that adopted the Uniform Act of 1939 have reached the same conclusion. *See, e.g.*, *Walter v. Curry*, 539 S.W.2d 264, 298 (Ark. 1976) ("[T]here must be a common liability to an injured party, and the injured party must have a possible remedy against both the party seeking contribution and the party from whom it is sought."); *Ozaki v. Ass'n of Apartment Owners of Discovery Bay*, 954 P.2d 644, 650 (Haw. 1998) (A tortfeasor "cannot be jointly and/or severally liable with another unless [t]he person who has been harmed can sue *and recover* from both.") (internal quotations omitted) (emphasis in original); *Blessing v. Town of S. Kingstown*, 1997 WL 839917, at *4 (R.I. Super. 1997) ("[T]o constitute joint tortfeasors under the act, both parties must have engaged in common wrongs.").

credit." *Id.* If the released party is not a joint tortfeasor, then those parties who are liable cannot claim any reduction in damages in the amount of the consideration paid for the release by the settling party. *Id.*

As the leading decision in this area, *Mullins* warrants further discussion. The plaintiffs were a husband and wife who filed a civil action alleging medical malpractice against the Medical Center of Delaware (the "Medical Center") and Ghassem I. Vakili, M.D. On the first day of trial, Dr. Vakili agreed to pay the Mullins $100,000 in return for a "joint tortfeasor's release," which the Mullins executed that day. "The Release not only extinguished the Mullins' claims against Dr. Vakili, but also assured Dr. Vakili of complete 'peace' by expressly incorporating the provisions of 10 *Del. C.* § 6304(b)." *Mullins*, 637 A.2d at 7. Dr. Vakili and the Medical Center had asserted cross-claims against each other, and as the Delaware Supreme Court noted, DUCATA authorized the Medical Center to reduce any judgment against it by the greater of the amount of the consideration paid for the release or the pro rata share of fault attributed to the settling tortfeasor. *Id.* The Medical Center opted to continue to prosecute its cross-claim against Dr. Vakili for purposes of obtaining the reduction.

The jury was given a special verdict form with four questions. The first question asked whether the jury found that the Medical Center "was negligent in a manner that proximately caused injury to the plaintiffs?" *Id.* The jury answered "Yes." The second question asked whether the jury found that Dr. Vakili "was negligent in the manner contended by the defendant Medical Center, and that such negligence of Ghassem Vakili, M.D. proximately caused injury to the plaintiffs?" *Id.* The jury answered "No." The third

54

question asked the jury to enter the amount of damages awarded each plaintiff. The jury awarded $75,000 to the wife and $15,000 to the husband, for total damages of $90,000. The final question asked the jury to enter the percentage of each defendant's liability, and the jury assigned 100% of the liability to the Medical Center. The Medical Center sought a credit against the judgment against in the amount of $100,000, equal to what Dr. Vakili paid in settlement. The Superior Court denied the request.

On appeal, the Delaware Supreme Court framed the "sole issue before this Court" as "whether the judgment rendered against the Medical Center should be deemed satisfied by reason of the credit provided for in [Section 6304(a)]." *Id.* After observing that the credit is "applicable exclusively to 'joint tortfeasors,'" the Delaware Supreme Court concluded that "the dispositive question in this appeal is whether Dr. Vakili is a joint tortfeasor within the meaning of [DUCATA]." *Id.* at 8.

The Delaware Supreme Court held that the Medical Center, as the party seeking contribution, had the burden of establishing that Dr. Vakili was a joint tortfeasor before it could claim any credit against its own liability.[17] In an effort to carry its burden, the

---

[17] *Id.* ("The Medical Center was required to demonstrate Dr. Vakili's joint tortfeasor status (i.e., that he was jointly liable in tort for the Mullins' injuries), as a prerequisite to claiming the credit provided for by Section 6304(a)."). The Restatement (Third) endorses this allocation of the burden of proof: "Since it is the defendant who alleges that the settling tortfeasor bore some or all of the responsibility for plaintiff's injury, the defendant has the burden of proof that the settling tortfeasor's tortious conduct was a legal cause of plaintiff's injury . . . and that defendant would otherwise have a valid contribution claim against the settling tortfeasor." Restatement (Third) § 16. Both the Restatement (Second) and the Restatement (Third) endorse the rule that if the settling party was not liable to the plaintiff, then the settling party is not liable for contribution and a non-settling defendant cannot claim a settlement credit. Restatement (Third) § 16

55

Medical Center argued that "Dr. Vakili's status as a joint tortfeasor was established solely by virtue of the settlement" and "was conclusive after [his] release by the Mullins." 637 A.2d at 8. The Delaware Supreme Court rejected this position, holding that the defendant must establish joint tortfeasor status through a determination "by some reliable means," which could be "either judicially or by an admission, that the settling party was liable in tort, i.e., a tortfeasor." *Id.*

The Delaware Supreme Court looked to the language of the release to see if it contained an admission of liability. The release stated that

> *[i]f it should appear* or be adjudicated in any suit, action or proceeding that Dr. Vakili was guilty of joint or joint and several negligence with caused injuries, losses or damages to the Releasors, in order to save Dr. Vakili, as further consideration for said payment, [plaintiffs] will satisfy any decree, judgment or award in which there is such a finding or adjudication involving Dr. Vakili on his behalf, to the extent of his liability for contribution, *if it is held* there is any liability for contribution.

*Id.* at 9 (emphasis in *Mullins*). The Delaware Supreme Court held that rather than admitting liability or establishing that the Medical Center had an incontestable right to the credit contemplated by DUCATA, the conditional language of the release made any protection against potential claims for contribution from other joint tortfeasors

---

cmt. c ("If the factfinder later determines that the settling tortfeasor bore no responsibility or on some other basis determined that the settling tortfeasor was not liable to the nonsettling tortfeasor for contribution (e.g., because of an immunity), the nonsettling tortfeasor receives no credit for that nonliable settling tortfeasor."); Restatement (Second) § 886A cmt. g ("If the one from whom contribution is sought is not in fact liable to the injured person, he is not liable for contribution.").

"unambiguously dependent upon a subsequent judicial determination of Dr. Vakili's liability as a joint tortfeasor." *Id.*

The Delaware Supreme Court then considered whether Dr. Vakili's liability had been determined by other reliable means. It had. The jury found that Dr. Vakili was not liable for negligence, so Dr. Vakili was not a joint tortfeasor.

Because Dr. Vakili was not a joint tortfeasor, the collateral source doctrine prevented the Medical Center from receiving any credit against its liability for the amount of Dr. Vakili's settlement payment. *Id.* at 10 ("In the absence of a determination that Dr. Vakili was a joint tortfeasor, under the collateral source rule, the Medical Center had no right to a credit because the payment by Dr. Vakili to the Mullins constituted compensation from an independent source."). The Delaware Supreme Court recognized that this rule potentially resulted in a plaintiff receiving more in compensation than what the fact-finder awarded for her injuries, because the plaintiff could obtain a settlement payment from one defendant and still recover in full against another. This is precisely what happened in *Mullins*, where the plaintiffs recovered $100,000 from Dr. Vakili, then still could recover their full judgment in the amount of $90,000 from the Medical Center. The plaintiffs thus obtained compensation equal to 211% of the amount of damages determined by the trier of fact.

After weighing the policy issues raised by the rule, the Delaware Supreme Court held that "the collateral source rule resolves what may be competing equities in favor of the innocent injured plaintiff receiving a windfall, rather than an admitted or adjudged tortfeasor bearing less than the full cost of his or her negligent conduct." *Id.* The

57

Restatement (Third) endorses this approach. *Id.* § 16, cmt. c ("If the factfinder later determines that the settling tortfeasor bore no responsibility or on some other basis determined that the settling tortfeasor was not liable to the nonsettling tortfeasor for contribution (e.g., because of an immunity), the nonsettling tortfeasor receives no credit for that nonliable settling tortfeasor.").

Under the foregoing principles, if the plaintiffs had proceeded to trial against all of the defendants, and if all of the defendants were held liable, the plaintiffs still could have recovered 100% of their damages from RBC. If RBC paid 100% of the judgment, it would have been up to RBC to seek contribution from the other defendants. If fewer than all of the defendants were held liable to the plaintiffs, then under DUCATA, RBC only could seek contribution from those defendants who were held liable, *i.e.*, the other joint tortfeasors. 10 *Del. C.* § 6302(a) ("The right of contribution exists among joint tortfeasors."). RBC would not be able to seek contribution from any defendant not held liable to the plaintiff. *Id.* § 6301 (limiting joint tortfeasor status to those "persons jointly or severally liable in tort for the same injury to person or property").

Similar principles govern RBC's effort to claim a credit for the Settlement. Under *Mullins*, the joint tortfeasor status of the Settling Defendants is a prerequisite to RBC's ability to claim any credit. The joint tortfeasor status of the Settling Defendants must be established by reliable means, such as an admission or a determination by the trier of fact. As the party seeking the credit, RBC bears the burden of establishing the joint tortfeasor status of each of the Settling Defendants.

58

### 1. The Effect Of RBC's Failure To Assert At Trial That The Settling Defendants Were Joint Tortfeasors

Because *Mullins* assigns to RBC the burden of proving that the Settling Defendants were joint tortfeasors, the plaintiffs claim that RBC waived its right to make that claim. Under this view, RBC had to assert at trial that the Settling Defendants were joint tortfeasors, just as the Medical Center sought a special jury verdict on Dr. Vakili's liability. RBC never did so. Its cross-claim did not contend that the Settling Defendants were joint tortfeasors. Rather, it disavowed any such assertion. Likewise, RBC stated in the Pre-Trial Stipulation that it would not be contending at trial that the Settling Defendants were joint tortfeasors, and it did not do so in its post-trial briefs. It may be the case that in a jury trial, the question of relative fault must be litigated during the trial on the merits so that the jury may "properly fulfill its role as trier of fact." *Ikeda v. Molock*, 603 A.2d 785, 787 (Del. 1991). Three precedents suggest that the same strictures do not apply in a bench trial, such that RBC did not lose its right to assert that the Settling Defendants were joint tortfeasors.

The first ruling is a transcript decision by Chief Justice Strine, then a Vice Chancellor. *Teachers' Ret. Sys. of La. v. Greenberg*, C.A. No. 20106-VCS (Del. Ch. July 13, 2007). The underlying case was a stockholder derivative action that challenged as self-interested transactions a series of insurance agency agreements between American International Group, Inc., and C.V. Starr & Co., Inc., a corporation owned by AIG's CEO Maurice R. Greenberg and other senior executives at AIG. The plaintiffs originally sued all of the directors of AIG for breach of fiduciary duty. After Greenberg left the

59

company, the plaintiffs settled with various outside and inside directors of AIG, while continuing with the suit against Greenberg and two senior executives who departed with him. Greenberg and his codefendants sought to assert claims for contribution against the directors who settled, and they argued that their claims for contribution should be heard as part of the underlying action so as to preserve the possibility of disproportionate fault under DUCATA. Chief Justice Strine rejected the application for practical reasons, finding that it would be "an awkward, weird trial to have" in which Greenberg would be arguing for part of the trial that no one had done anything wrong and then for another part of the trial that the other directors had engaged in the wrongful conduct. *Id.* at 6-7. By contrast, if Greenberg prevailed, there would be no need for a contribution action. The court concluded that any contribution claims should be litigated, if at all, after the resolution of the underlying proceeding, with the possibility of disproportionate liability preserved. *Id.*

The second ruling is a decision by Chancellor Allen. *Odyssey P'rs, L.P. v. Fleming Cos., Inc.*, 1997 WL 38134 (Del. Ch. Jan. 24, 1997). Minority stockholders sued the corporation's controlling stockholder and four out of five directors for allegedly breaching their fiduciary duties by allowing the controller to foreclose on the corporation's assets. After several months of discovery, the four directors moved to assert a third-party claim for contribution against a fifth director (Banks) who had been appointed by the minority stockholders. Chancellor Allen declined to permit the third-party claim to go forward, explaining, "[o]bviously, if the defendants are not liable, it would be more efficient to save Banks the expenses associated with active party status."

60

*Id.* at *3. The third-party claim therefore offered "only a very unclear claim of greater efficiency and certainly represent[ed] an attempt to use the joinder of party rules to gain tactical advantage." *Id.* Like the *Teachers* ruling, the *Odyssey Partners* decision contemplated that contribution issues could best be sorted out after the liability determinations.

The third precedent is *McLean II*. In that case, Judge Schwartz did not hold that the accountant and his firm could not claim the DUCATA settlement credit and argue about unequal responsibility in post-trial proceedings. He first issued *McLean I*, in which he found that the accountant and his firm were liable. He then issued *McLean II*, in which he addressed the issues raised by DUCATA and the settlement credit.

Based on these precedents, it does not appear that RBC waived its right to argue during post-trial proceedings that the Settling Defendants are joint tortfeasors and that responsibility for the damage suffered by the Class should be allocated according to relative fault. They simply had to do so based on the record created at trial and in light of the factual findings in the Liability Opinion.

### 2. The Effect Of The Settlement

For its part, RBC contends that it need not now establish that the Settling Defendants were joint tortfeasors, because the plaintiffs conceded that fact by entering into the Settlement. Alternatively, RBC argues that the plaintiffs should now be estopped to contend otherwise. *Mullins* forecloses both positions.

RBC argues that by executing the Settlement, the plaintiffs "assumed the contribution risk and RBC's damages must be reduced by the aggregate pro rata share of

the Rural/Metro Defendants and Moelis." Dkt. 369 at 10. In *Mullins*, the Delaware

Supreme Court held that Dr. Vakili's settlement did not establish his status as joint

tortfeasor because it did not contain an admission of liability. 637 A.2d at 9. Subsequent

Delaware decisions have followed *Mullins* in holding that a settlement does not establish

the joint tortfeasor status of the settling party if it does not contain an admission of

liability.[18] "Rather, whether a party is a joint tortfeasor must be determined in a reliable

manner, either by a judicial finding by the trier of fact or by an admission."[19]

Like the release in *Mullins*, neither the agreements in principle nor the Settlement

Stipulation contained any admissions of liability on the part of the Settling Defendants.

Moreover, the language of the Settlement Stipulation and Partial Final Judgment

conditioned any reduction in RBC's damages on a subsequent determination that the

Settling Defendants were liable to the plaintiffs. The Settlement Stipulation contained the

following provision, which was repeated in the proposed implementing order: "Pursuant

to 10 *Del. C.* §6304(b) the damages recoverable against non-settling defendant RBC and

---

[18] *See, e.g., Lemon v. Fairley*, 2010 WL 4138555, at *1 (Del. Super. Oct. 20, 2010); *Roca v. Riley*, 2008 WL 1724259, at *2 (Del. Super. Apr. 10, 2008); *Capano v. Capano*, 2003 WL 22843906, *2 (Del. Ch. Nov. 14, 2003); *Harney v. Spencer*, 1994 WL 750338, at *1 (Del. Super. Dec. 27, 1994).

[19] *Roca*, 2008 WL 1724259, at *2; *accord Capano*, 2003 WL 22843906, at *2 ("[T]o qualify as a tortfeasor, there must have been some reliable determination, either judicially or by admission, that the person was liable in tort."); *Hall v. Gunzl*, 723 A.2d 385, 387 (Del. Super. 1998) ("There must be a reliable means, even in an imputed negligence situation, for there to be determined that the settling party, here Gibson, was a tortfeasor."); *see Johnson v. Kelly Servs. Ir., Ltd.*, 2003 WL 164289, at *3-4 (Del. Ch. Jan. 8, 2003) (holding that admission of liability in pre-trial stipulation was reliable means of establishing joint liability of settling tortfeasor).

any other alleged tortfeasor will be reduced to the extent of the pro rata shares, if any, of Moelis and the Rural/Metro Defendants." Dkt. 323, ¶ 13 & Ex. E. This provision referenced Section 6304(b), under which any settlement credit is limited to joint tortfeasors, and it spoke of the "pro rata shares, if any" of damages for which Moelis and the Rural/Metro Defendants otherwise would be liable. The words "if any" recognized that the Settling Defendants might not have any share of liability, or in other words that Moelis and the Rural/Metro Defendants might not be joint tortfeasors. The Settlement therefore did not establish the joint tortfeasor status of Moelis or the Rural/Metro Defendants.

In a related argument, RBC contends that a combination of the Settlement and principles of estoppel bar the plaintiffs from disputing that the Settling Defendants are joint tortfeasors. Judicial estoppel applies in Delaware when (i) "a litigant advances a position inconsistent with a position taken in the same or earlier legal proceeding" and (ii) "the court was persuaded to accept the previous argument as a basis for its earlier ruling." *VIII-Hotel II P Loan Portfolio Hldgs., LLC v. Zimmerman*, 2013 WL 5785290, at *3 (Del. Super. Ct. Sept. 19, 2013). The party's prior position will be considered a "basis" for the court's ruling where (i) the prior position "contributed to the court's decision," *Julian v. E. States Const. Serv., Inc.*, 2009 WL 1211642, at *7 (Del. Ch. May 5, 2009); (ii) the court "relied" on the party's prior position, *Zimmerman*, 2013 WL 5785290, at *3; or (iii) the party's newly inconsistent position "contradicts" the court's ruling, *Banet v. Fonds de Regulation et de Controle Cafe Cacao*, 2010 WL 1066993, at *4 (Del. Ch. Mar. 12, 2010).

The doctrine of quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken. Quasi-estoppel applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Pers. Decisions, Inc. v. Bus. Planning Sys.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008) (internal quotation marks omitted). "To constitute this sort of estoppel the act of the party against whom the estoppel is sought must have gained some advantage for himself or produced some disadvantage to another." *Id.* "A party does not need to show reliance for quasi-estoppel to apply." *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *6 (Del. Ch. Nov. 19, 2013).

RBC observes that until the Settlement, the plaintiffs argued that the directors had breached their fiduciary duties and that Moelis aided and abetted the breach. RBC contends that the plaintiffs' arguments contributed to the court's decision in the Liability Opinion, rendering judicial estoppel applicable. Alternatively, RBC contends that based on the same arguments, the plaintiffs were able to extract the Settlement, rendering quasi-estoppel applicable. Dkt. 369 at 13-16.

In my view, *Mullins* forecloses RBC's estoppel theories. In that case, the plaintiffs originally asserted that Dr. Vakili was liable in negligence, and they extracted a settlement from Dr. Vakili on that basis. The plaintiffs then reversed course and maintained for purposes of the Medical Center's contribution claim that Dr. Vakili was not negligent, and they prevailed on that basis. The Delaware Supreme Court did not have any difficulty with the plaintiffs' course of action in *Mullins*. What transpired there

and in this case followed the normal progression of a lawsuit against multiple defendants where there is a partial settlement. A plaintiff first asserts that all defendants are liable, then later settles with a subset of the defendants. If principles of estoppel barred the settling plaintiff from disputing the settling defendants' status as joint tortfeasors, that analysis would, as a practical matter, overrule *Mullins*. Instead, *Mullins* holds that a settlement is not enough unless it contains an admission of liability. The question of the Settling Defendants' status as joint tortfeasors thus remained to be decided.

### 3. Prejudice To RBC From The Agreements In Principle

During oral argument, RBC pressed the theory that it should not have to establish now that the Settling Defendants were joint tortfeasors because the timing of the agreements in principle prejudiced RBC by depriving RBC of the opportunity to prove its claims for contribution at trial. The situation that RBC faced is a function of being the last non-settling defendant. It is endemic to the litigation process and not a predicament that should relieve RBC of its burden to prove joint tortfeasor status under *Mullins*.

The Delaware Supreme Court has held that when parties to a case execute a settlement that releases a defendant from liability for contribution and the defendant does not admit liability, the released defendant must remain a party to the case for purposes of trial to facilitate a determination of the released defendant's status as a joint tortfeasor. *Ikeda*, 603 A.2d at 787. If the non-settling defendants wish to contend that the settling defendant's pro rata share of liability, and hence any settlement credit, should be based upon relative fault, then the non-settling defendants must file a cross-claim against the settling defendant. *Id.* (stating that before disproportionate fault can be litigated, "Section

65

6306(d) "requires the filing of a cross-claim between parties to the litigation"); *see* 10 *Del. C.* § 6306(d) (providing that if judgment has been entered against some or all of the joint tortfeasors in a single action, then as to them, the rule of equal allocation applies unless "the issue of proportionate fault [was] litigated between them by cross-complaint in that action").

Delaware cases offer examples of settlements involving codefendants that occurred in close proximity to trial and left the remaining defendant to litigate the issue of relative fault. *See Ikeda*, 603 A.2d at 785 (settling "[s]everal days prior to trial"); *Winker v. Balentine*, 254 A.2d 849, 850-51 (Del. 1969) (settlement on the morning of trial). These cases have not found that the non-settling defendant suffered prejudice.

On at least two occasions, this court has approved settlements in representative actions with a subset of the defendants and permitted the action to continue against the remaining defendants. One example is the *Teachers* decision, discussed previously. *See* Part II.D.1, *supra.* Another is *Frazer v. Worldwide Energy Corp.*, 1991 WL 74041 (Del. Ch. May 2, 1991), where the plaintiffs were pursuing claims for breach of fiduciary duty following a merger. The plaintiffs settled with the individual defendants for a payment of $1 million and proposed to continue to litigate against the corporate defendants. As in this case, the release extinguished the corporate defendants' right of contribution and contemplated that the corporate defendants would receive the DUCATA settlement credit. Unlike in this case, the corporate defendants objected to the settlement, in part because of its effect on their contribution rights. Justice Jacobs, then a Vice Chancellor, approved the settlement. *Id*. at *5-6.

In this case, consistent with *Ikeda*, the Settling Defendants remained parties to the action for purposes of trial after the agreements in principle were reached. Also consistent with *Ikeda,* RBC filed a cross-claim seeking contribution against the Rural/Metro Defendants and Moelis, and RBC had the opportunity to develop a record to support its contribution claims at trial. Three of the individual defendants testified at trial (DiMino, Shackelton, and Walker). RBC could have issued trial subpoenas to compel the other individual defendants to appear or to cause Moelis to appear through specified directors, officers, or managing agents. *In re Activision Blizzard, Inc.*, 86 A.3d 531, 551 (Del. Ch. 2014). The Settling Defendants were not released from the case until six months after trial, when the court conducted a hearing on the Settlement and entered the Partial Final Judgment. RBC did not object to the Settlement or the entry of the Partial Final Judgment.

RBC was not prejudiced by the agreements in principle and has not been deprived of its opportunity to assert that the Settling Defendants were joint tortfeasors. RBC had the opportunity during trial to introduce evidence and develop a record in support of its contribution claims. RBC retained the opportunity to claim the settlement credit contemplated by DUCATA, which this decision addresses.

## E.    Joint Tortfeasor Status

Having disposed of the various reasons advanced by the parties as to why the joint tortfeasor status of the Settling Defendants need not be determined, this decision must confront the issue. Only two of the Settling Defendants—Shackelton and DiMino— qualify as joint tortfeasors.

67

### 1. The Director Defendants

As to the director defendants, RBC claims that the Liability Opinion's "determination that the Directors breached their fiduciary duties is 'dispositive' of the question of whether the Directors and RBC share a common liability—they now do." Dkt. 369 at 17. Under DUCATA, joint tortfeasor status depends on common liability, not joint culpability. The Liability Opinion established that the directors breached their fiduciary duties. It did not determine whether, but for the Settlement, they were liable to the Class.

### a. Exculpation Under Section 102(b)(7)

To determine whether the directors were liable to the Class, this decision must address the availability of exculpation under Section 102(b)(7). How Section 102(b)(7) affects a right of contribution presents a question of first impression, but Delaware decisions interpreting DUCATA have long held that if a statute or common law doctrine would prevent a party from being held liable for money damages for the underlying harm based on the claim being asserted, then the party is not a joint tortfeasor against whom an action for contribution will be available.

The leading Delaware decision on this issue remains then-Judge, later Justice Carey's opinion in *Lutz*, which was issued in 1953, just four years after the adoption of DUCATA. Following a two-car accident, the driver of one of the cars (Lutz) and his three passengers sued the driver of the second car (Boltz) for negligence. Boltz moved to file a counterclaim against Lutz, seeking contribution in the event he was held liable for the plaintiffs' injuries. The counterclaim sought contribution on the grounds that that

68

Lutz was negligent, and Justice Carey framed the issue for decision as "whether a tortfeasor may recover contribution from another, whose negligence concurred in producing an injury, but who is himself not liable to the injured person." 100 A.2d at 647. Lutz could not be liable for negligence to his three passengers under the Delaware Guest Statute, subsequently repealed in 1983, which stated:

> No person transported by the owner or operator of a motor vehicle . . . as his guest without payment for such transportation shall have a cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident was intentional on the part of such owner or operator, or was caused by his willful or wanton disregard of the rights of others.[20]

Boltz's proposed counterclaim did not allege that Lutz caused the accident intentionally or by willfully or wantonly disregarding the rights of others. 100 A.2d at 647. Judge Carey held that "it is joint [and] several liability, rather than joint or concurring negligence, which determines the right of contribution." *Id.* at 648. Boltz therefore had not stated a claim for contribution against Lutz, and his motion to amend was denied. *Id.*

After *Lutz*, courts applying the Guest Statute consistently rejected claims for contribution if the party seeking it only pled or proved negligence.[21] Courts permitted claims for contribution to go forward when the party seeking contribution overcame the

---

[20] The *Lutz* decision does not quote the text of the since-repealed statute. Its language can be found, among other places, in *Winkler v. Balentine*, 254 A.2d 849, 850 n.2 (Del. 1969).

[21] *See, e.g., Mumford v. Robinson*, 231 A.2d 477, 478 (Del. 1967); *Selheimer v. Moore*, 1986 WL 1258, at *3 (Del. Super. Jan. 28, 1986); *Rigsby v. Tyre*, 380 A.2d 1371, 1372-73 (Del. Super. 1977).

limitations of the Guest Statute by pleading and later proving that the accident was caused intentionally or because of willful or wanton conduct.[22] Courts also extended *Lutz*'s reasoning to other situations.[23] The decisions followed a pattern: the party seeking contribution could not obtain it if the injured party could not have prevailed under the theory set out in the cross-claim seeking contribution, but the party seeking contribution could obtain it if the party pled and later proved facts supporting a theory under which the injured party could have recovered.

In a case that provides an example of the latter scenario, the United States District Court for the District of Delaware considered whether defendants could seek contribution from the City of Wilmington to the extent they were held liable to the New Zealand Kiwifruit Marketing Board for the loss in value of a shipment of kiwifruit that was partially destroyed while in a warehouse operated by the city. *N.Z. Kiwifruit Mktg. Bd. v. City of Wilm.*, 825 F.Supp. 1180 (D. Del. 1993). The City argued that it could not be

---

[22] *See, e.g., Winkler*, 254 A.2d at 849 (noting that cross-claim for contribution alleged "wanton conduct"); *Pringle*, 1981 WL 383062, at \*1 (same).

[23] *See Cox v. Del. Elec. Coop., Inc.*, 823 F. Supp. 241, 246 (D. Del. 1993) (barring suit for contribution where defendant could not be "liable in tort" to injured party under Pennsylvania Workmen's Compensation Act); *Walker v. Patterson*, 325 F. Supp. 1024, 1027 (D. Del. 1971) (barring suit for contribution where defendant could not be liable to injured party under Delaware Workmen's Compensation Act); *Farrall v. Amstrong Cork. Co.*, 457 A.2d 763, 768 (Del. 1983) (same); *Stahorn v. Sears, Roebuck & Co.*, 123 A.3d 107, 109-10 (Del. Super. 1956) (barring suit for contribution claiming negligence against father where injured party was his child, and common law barred child from suing parent in tort in a case of ordinary negligence); *Ferguson v. Davis*, 102 A.2d 707, 708 (Del. Super. 1954) (barring suit for contribution against husband where was injured party was his wife, and wife could not sue husband under then-extant common law rule).

liable to the plaintiff because it was "immune from suit on any and all tort claims seeking recovery of damages" under Delaware's County and Municipal Tort Claims Act, 10 *Del. C.* § 4011. The parties seeking contribution argued that they had alleged claims that fell within exceptions recognized under 10 *Del. C.* § 4012. *Kiwifruit*, 825 F.Supp. at 1183-84. The district court held that to state a claim for contribution, the legal theory had to fall within one of the exceptions. *Id.* at 1187. The court then agreed with the parties seeking contribution that they had pled such a claim. *Id.* at 1190 ("[T]he City, in turn, may still be liable to codefendants for a claim of contribution for damage arising from those acts.").

In my view, exculpation under Section 102(b)(7) operates similarly to the Guest Statute considered in *Lutz* and the Tort Claims Act considered in *Kiwifruit*, such that Section 102(b)(7) should be treated similarly for purposes of DUCATA. Section 102(b)(7) states that the certificate of incorporation of a Delaware corporation may contain

> [a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 *Del. C.* § 102(b)(7). Like the Guest Statute and the Tort Claims Act, Section 102(b)(7) authorizes a broad entitlement to exculpation from monetary damages for breaches of fiduciary duty. Also like the Guest Statute and the Tort Claims Act, Section 102(b)(7) identifies exceptions where exculpation does not apply. Under the reasoning of *Lutz*,

71

*Kiwifruit*, and similar decisions, if RBC wishes to claim DUCATA's settlement credit for one or more of the director defendants, then RBC must show that the director would be liable, including by establishing that the claim against the director fell into one of the exceptions recognized by Section 102(b)(7).

RBC attempts to avoid the *Lutz* line of authority by relying on *Shiles v. Reed Trucking Co.*, 1995 WL 790974 (Del. Super. Dec. 5, 1995), a case that considered what would happen if the injured plaintiff had permitted the statute of limitations to run against a joint tortfeasor. RBC also cites a different section of the *Kiwifruit* decision that considered this issue. *See Kiwifruit*, 825 F. Supp. at 1186-87.

As a matter of formal logic, a joint tortfeasor can argue under *Lutz* that because a plaintiff who had let the statute of limitations run could not recover against the joint tortfeasor, a defendant seeking contribution should not be able to recover either. That logic does not hold because the right of contribution does not arise until one defendant has paid more than its pro rata share. 10 *Del. C.* § 6302(b); *see* RESTATEMENT (FIRST) OF RESTITUTION § 82 (1937) ("A person . . . is entitled to contribution from the other when, and only when, he has discharged more than his proportionate share . . . ."). The lapse of the statute of limitations in the underlying action therefore does not control the ability to seek contribution. Restatement (Third) § 23, cmt. k; Restatement (Second) § 886A, cmt. g. More generally, the purpose of creating a right of contribution was to alter the power that the common law gave a plaintiff ability to impose a loss arbitrarily on certain defendants simply by choosing to sue some and not others. Allowing a plaintiff to defeat a defendant's right to contribution by permitting the statute of limitations to run would go

a long way towards restoring the disfavored common law rule. *Shiles* and *Kiwifruit* held that a defense based on the running of the statute of limitations does not bar an action for contribution. *Kiwifruit*, 825 F. Supp. at 1186-87; *Shiles*, 1995 WL 790974, at *2. So have other Delaware cases.[24]

Rather than recognizing the narrow, limitations-based rule that emerges from these decisions, RBC construes *Shiles* as (i) establishing a distinction between an immunity and an affirmative defense, and (ii) holding that a claim for contribution is not barred by an affirmative defense. Dkt. 378 at 15-16. RBC points out that Delaware Supreme Court has described Section 102(b)(7) as "in the nature of an affirmative defense." Dkt. 369 at 31 n.50 (citing *Malpiede*, 780 A.2d at 1092). According to RBC, Section 102(b)(7) cannot bar an action for contribution, just like the affirmative defense of the statute of limitations cannot bar the action. This reasoning dramatically expands the statute of limitations analysis in *Shiles* and *Kiwifruit*. It also ignores the critical distinction between a statute of limitations defense and other types of defenses, like Section 102(b)(7). A statute of limitations defense arises because of the timing of the filing of the lawsuit, which is within the control of the plaintiff. A defense based on Section 102(b)(7) is a feature of substantive law that limits the scope of the claim. A contribution-plaintiff should not be prejudiced by the failure of the plaintiff in the

---

[24] *Builders & Managers, Inc.*, 2004 WL 304357 at *4; *Shinault v. Nationwide Mut. Ins. Co.*, 1995 WL 270089, at *1 (Del. Super. Mar. 13, 1995); *Royal Car Wash Co. v. Mayor and Council of Wilm.*, 240 A.2d 144, 145 (Del. Super. 1968); *Goldsberry v. Frank Clendaniel, Inc.*, 109 A.2d 405, 407-08 (Del. Super. 1954).

underlying action to sue in timely fashion. A contribution-plaintiff does have to show that the plaintiff could have recovered from the contribution-defendant on the merits.

*Kiwifruit* and *Shiles* did not change the principles of law developed by *Lutz* and subsequent decisions. Under *Lutz,* if the director defendants would have been entitled to exculpation, then RBC could not obtain contribution from them and cannot now claim the settlement credit.

### b. The Standard For Determining Whether Exculpation Is Available

The Delaware Supreme Court has held that for an exculpatory provision to apply, the court must find that "the factual basis for [the] claim *solely* implicates a violation of the duty of care." *Emerald P'rs v. Berlin (Emerald I)*, 726 A.2d 1215, 1224 (Del. 1999); *accord Emerald P'rs v. Berlin (Emerald II)*, 787 A.2d 85, 98 (Del. 2001) (holding that defendant directors can obtain exculpation only if they prove that their breach of duty was "exclusively attributable to a violation of the duty of care"). Liability is assessed on a director-by-director basis. "The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." *Emerging Commc'ns*, 2004 WL 1305745, at *38; *accord Venhill Ltd. P'ship ex rel. Stallkamp v. Hillman*, 2008 WL 2270488, at *23 (Del. Ch. June 3, 2008).

In a case where the standard of review places the burden of proof on the defendant fiduciaries, the burden of making this showing "falls upon the director." *Emerging Commc'ns,* 2004 WL 1305745, at *40; *accord Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130,

1164 (Del. Ch. 2006). Under *Mullins*, however, RBC has the burden of proving that the director defendants were jointly liable to the Class. 637 A.2d at 8. RBC therefore has the burden of proving that exculpation was not available because the factual basis for the claim of breach did not "*solely* implicate[] a violation of the duty of care." *Emerald P'rs*, 726 A.2d at 1224. Stated affirmatively, RBC must establish that a disloyal state of mind contributed causally to the director's breach of duty.

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Corporate fiduciaries "are not permitted to use their position of trust and confidence to further their private interests." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939). The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (internal quotation marks omitted). A plaintiff can call into question a director's loyalty by showing that the director was interested in the transaction under consideration or not independent of someone who was.[25] A plaintiff also can demonstrate

---

[25] *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Id.* at 253 & n.13. The *Brehm* Court held that, going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Id.* at 253. This

that the director failed to pursue the best interests of the corporation and its stockholders and therefore failed to act in good faith: "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[26]

Directors must seek "to promote the value of the corporation for the benefit of its stockholders."[27] When considering whether to pursue a strategic alternative such as a merger, directors must act loyally, prudently, and in good faith for the purpose of

---

decision does not rely on any of those decisions for the standard of appellate review and therefore omits the cumbersome subsequent history.

[26] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006); *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ." (quoting *Disney*, 906 A.2d at 67)); *see Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[27] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010); *accord N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder[ ] owners." (internal quotation marks omitted)); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *see also* Leo E. Strine, Jr., et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

maximizing the long-term value of the corporation for the benefit of its residual claimants, *viz.*, the common stockholders.[28] "When deciding whether to pursue a strategic alternative that would end or fundamentally alter the stockholders' ongoing investment in the corporation, the loyalty-based standard of conduct requires that the alternative yield value exceeding what the corporation otherwise would generate for stockholders over the long-term."[29] Importantly, "[t]he duty to act for the ultimate benefit of stockholders does

---

[28] *See Gantler v. Stephens*, 965 A.2d 695, 706 (Del. 2009) (holding that "enhancing the corporation's long term share value" is a "distinctively corporate concern[]"); *Gheewalla*, 930 A.2d at 101 ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder[] owners." (internal quotation marks omitted)); *Unocal*, 493 A.2d at 955 (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *eBay*, 16 A.3d at 34 (explaining that directors must seek "to promote the value of the corporation for the benefit of its stockholders"); *TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *7 (Del. Ch. Mar. 2, 1989) (Allen, C.) (describing as "non-controversial" the proposition that "the interests of the shareholders as a class are seen as congruent with those of the corporation in the long run" and explaining that "[t]hus, broadly, directors may be said to owe a duty to shareholders as a class to manage the corporation within the law, with due care and in a way intended to maximize the long run interests of shareholders"); William T. Allen, *Ambiguity in Corporation Law*, 22 Del. J. Corp. L. 894, 896-97 (1997) ("[I]t can be seen that the proper orientation of corporation law is the protection of long-term value of capital committed indefinitely to the firm."); Andrew A. Schwartz, *The Perpetual Corporation*, 80 G. Wash. L. Rev. 764, 777-83 (2012) (arguing that the corporate attribute of perpetual existence calls for a fiduciary mandate of long-term value maximization for the stockholders' benefit).

[29] *In re Trados Inc. S'holder Litig. (Trados II)*, 73 A.3d 17, 37 (Del. Ch. 2013). *Compare Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43-44 (Del. 1994) (holding it was reasonably probable that directors breached their fiduciary duties by pursuing ostensibly superior value to be created by long-term strategic combination when, post-transaction, a controller would have "the power to alter that vision," rendering its value highly contingent), *and Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) (holding that alternative of maintaining corporation as stand-alone entity and use of defensive measures to preserve that alternative "became moot"

not require that directors fulfill the wishes of a particular subset of the stockholder base."[30] Directors must exercise their independent fiduciary judgment: "Delaware law confers the management of the corporate enterprise to the stockholders' duly elected board representatives. The fiduciary duty to manage a corporate enterprise includes the selection of a time frame for achievement of corporate goals. That duty may not be delegated to the stockholders." *Time*, 571 A.2d at 1154 (citation omitted).

---

once board determined that values achievable through a sale process exceeded board's assessment of stand-alone value), *with Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1155 (Del. 1990) (holding it was not reasonably probable that directors breached their fiduciary duties by pursuing superior long-term value of strategic, stock-for-stock merger without a post-transaction controller), *Unocal*, 493 A.2d at 956 (holding it was not reasonably probable that directors breached their fiduciary duties by adopting a selective exchange offer to defend against a two-tiered tender offer where blended value of offer was less than $54 per share and board reasonably believed stand-alone value of corporation was much greater), *and Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 108-09, 112, 129 (Del. Ch. 2011) (holding that board complied with fiduciary duties by maintaining a rights plan to protect higher stand-alone value of corporation rather than permit immediate sale).

[30] *Trados II*, 73 A.3d at 38; *accord In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 655 (Del. Ch. 2008) (Strine, V.C.) ("Directors are not thermometers, existing to register the ever-changing sentiments of stockholders. . . . During their term of office, directors may take good faith actions that they believe will benefit stockholders, even if they realize that the stockholders do not agree with them."); *Paramount Commc'ns Inc. v. Time Inc.*, 1989 WL 79880, at \*30 (Del. Ch. July 14, 1989) (Allen, C.) ("The corporation law does not operate on the theory that directors, in exercising their powers to manage the firm, are obligated to follow the wishes of a majority of shares. In fact, directors, not shareholders, are charged with the duty to manage the firm."), *aff'd in pertinent part*, 571 A.2d 1140; *TW Servs.*, 1989 WL 20290, at \*8 n.14 ("While corporate democracy is a pertinent concept, a corporation is not a New England town meeting; directors, not shareholders, have responsibilities to manage the business and affairs of the corporation, subject however to a fiduciary obligation.").

### c.  Shackelton

The evidence convinces me that Shackelton would not have been entitled to exculpation for his role in engineering a near-term sale of Rural. In making this finding, I do not claim to have read Shackelton's mind or know his true intentions. As the Delaware Supreme Court trenchantly observed, "the members of the Court of Chancery cannot peer into the hearts and souls of directors." *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 106 (Del. 2013) (internal quotation marks omitted). Rather, this court must make factual findings based on the evidence and its assessment of Shackelton's credibility as a witness. *Cf. State v. Anderson*, 74 A. 1097, 1099 (Del. 1910) (recognizing that intent "may be found by direct evidence, such as the admissions or declarations of the accused, or by indirect evidence; that is by the rational inferences to be drawn from what the accused is proven to have done or said, and from all the facts and circumstances involved in the transaction"). In this case, I find that when seeking successfully to put Rural into play without Board authorization, Shackelton was sufficiently motivated by his personal interests and those of his fund that exculpation would not have been available.

The Liability Opinion found that Shackelton's personal circumstances inclined him to favor a near-term sale. Liability Op, 88 A.3d at 64. Shackelton was a managing director of Coliseum Capital Partners, L.P. ("Coliseum"), an activist hedge fund he co-founded in 2006. Coliseum followed a business strategy of taking concentrated positions in small-cap companies, obtaining influence, and then seeking to facilitate an exit within approximately three to five years, and it employed this strategy with Rural. In 2007 and 2008, Coliseum accumulated approximately 12.43% of Rural's stock at an average cost

79

of around $4 per share. Shackelton became a director in April 2008. "By 2010, Rural had grown to 22% of Coliseum's portfolio—twice the target size for a core position—and the unrealized capital gain represented Coliseum's most successful investment. Shackelton saw an M & A event as the next logical step. . . ." *Id.*

The Liability Opinion found that Shackelton's interest in a near-term sale was accentuated by DiMino's business plan. 88 A.3d at 65. In 2010, the Board hired DiMino as CEO with a mandate to grow the Company, and DiMino planned to spend $50 million per year on acquisitions over the next five years. DiMino's growth plan conflicted with Coliseum's investment strategy, which favored companies with predictable cash flows, avoided companies whose valuations relied on exceptional growth, and often penalized companies for acquisitions. *Id.*

Perhaps most significantly, in late 2010, Coliseum was seeking to raise $150–$200 million of new capital, more than ever before. *Id.* A sale of Rural would be a feather in Shackelton's cap and could be used to market the fund to new investors. *Id.*

Consistent with his personal interests and those of his fund, Shackelton initially attempted to engineer a sale of Rural in October 2010, when a consortium of two bidders approached expressed interest in acquiring Rural for $10.50 to $11.50 per share. *Id.* at 64. The Board regarded that price as too low to justify engagement. After Shackelton engaged, the consortium suggested it could raise the high end of its range to $15.00 per share. Discussions ended when one of the two members of the consortium withdrew and the remaining member declined to proceed alone. *Id.*

Shackelton's heated reaction to the consortium's withdrawal illuminated his desire for a near-term sale. Shackelton came to believe that, during the management presentations to the consortium, DiMino had intimated his preference for Rural to remain independent. Shackelton was incensed that DiMino had undermined the process and believed DiMino acted to protect his job. Liability Op., 88 A.3d at 66. Shackelton also felt DiMino had engaged in "completely unacceptable behavior" by reaching out to a second private equity firm to validate the consortium's bid and potentially generate price competition. *Id.* Based on the evidence presented at trial, I had a contrary impression of DiMino's actions and believe he acted appropriately and in good faith based on his assessment of the stand-alone value of the Company.

Shackelton resumed his campaign for a near-term sale in early December 2010, when rumors began circulating that EMS was in play. On December 8, 2010, the Board held a regular meeting. Shackelton segued from a discussion of the rumors about EMS and into a full presentation about strategic alternatives. He explained why he felt market conditions were conducive to M & A activity, then outlined what he saw as Rural's three strategic alternatives:

> (1) continue to pursue the Company's current standalone business plan (including taking advantage of opportunities to purchase smaller competitors); (2) pursue a sale of the Company; or (3) pursue a transaction that would seek to take advantage of the synergies available via some form of business combination transaction involving [AMR].

*Id.* at 67. Shackelton told the Board that he "had not formulated a preference among the three basic alternatives," but he "did recommend that the Company should move expeditiously to retain appropriate advisers and obtain advice regarding an appropriate

81

course of action." *Id.* The Board responded by re-activating the Special Committee and charged it with retaining advisors and generating a recommendation on the best course of action. The Board did not authorize the Special Committee to pursue a sale. *Id.*

Despite the Special Committee's limited mandate, Shackelton led the committee in hiring RBC as the Company's lead banker. RBC's presentation focused on marketing Rural to private equity firms. 88 A.3d at 68. RBC's internal, post-hiring communications evidenced that the firm understood that it was hired to sell Rural. DiMino believed that the Special Committee had hired RBC to sell Rural and emailed Tony Munoz, the lead RBC banker, stating "[w]ell done, let's get this baby sold!" *Id.* Shackelton and RBC then proceeded to put Rural into play, without Board authorization. *Id.* at 69. "At the time, the Board had not authorized the Special Committee to hire a 'sellside' advisor or start a sale process." *Id.* And Shackelton and RBC did so despite the "the readily foreseeable problems associated with trying to induce financial buyers to engage in two parallel processes for targets who were direct competitors." *Id.* at 70.

Ordinarily, Coliseum's large block of stock and Shackelton's duties to Coliseum would align Shackelton's interests with those of Rural's stockholders.[31] But in this case,

---

[31] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 600 (Del. Ch. 2010) (Strine, V.C.) (explaining that owning a "material" amounts of stock gives directors a "motivation to seek the highest price" and the "personal incentive as stockholders to think about the trade off between selling now and the risks of not doing so"); *Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002) (explaining that "[a] director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders"); *Katell v. Morgan Stanley Gp., Inc.*, 1995 WL 376952, at *12 (Del. Ch. June 15, 1995) ("Delaware

the evidence at trial established that Shackelton and his fund had unique reasons to favor a near-term transaction that caused their interests to diverge from those of the Rural's equity as a whole. Delaware cases recognize that a desire for liquidity is one "benefit that may lead directors to breach their fiduciary duties," and stockholder directors may be found to have breached their duty of loyalty if a "desire to gain liquidity . . . caused them to manipulate the sales process" and subordinate the best interests of the corporation and the stockholders as a whole.[32] A party cannot simply argue in the abstract that a particular

---

law presumes that investors act to maximize the value of their own investments."); *In re Mobile Commc'ns Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392, at *9 (Del. Ch. Jan. 7, 1991) (Allen, C.) (noting that directors' substantial stockholdings gave them "powerful economic (and psychological) incentives to get the best available deal"), *aff'd*, 608 A.2d 729 (Del. 1992).

[32] *In re Answers Corp. S'holder Litig. (Answers I)*, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012); *see McMullin v. Beran*, 765 A.2d 910, 924-25 (Del. 2000) (reversing grant of motion to dismiss where complaint alleged that controlling stockholder and its director designees sacrificed value in a sale to achieve controlling stockholder's goal of obtaining near-term liquidity and significant component of the transaction consideration in cash); *N.J. Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *9-10 (Del. Ch. Sept. 30, 2011) (denying motion to dismiss where the plaintiff alleged that the director who was also a large stockholder sacrificed value in sale because he needed liquidity to satisfy personal debts and fund a new venture); *In re TeleCorp PCS, Inc. S'holders Litig.*, Cons. C.A. No. 19260-VCS, at 16 (Del. Ch. June 17, 2002) (TRANSCRIPT) (Strine, V.C.) ("What [these large stockholders] weren't entitled to do was to use their influence as fiduciaries to procure liquidity from AT&T Wireless on the backs of public stockholders in an unfair merger."); *see also In re S. Peru Copper Corp. S'holder Deriv. Litig.,* 52 A.3d 761, 780 (Del. Ch. 2011) (Strine, C) (considering large stockholder's desire for liquidity when evaluating performance of affiliated special committee member as part of assessment of entire fairness of transaction with controller; stating "[a]lthough I am not prepared on this record to find that Handelsman consciously agreed to a suboptimal deal for Southern Peru simply to achieve liquidity for Cerro from Grupo Mexico, there is little doubt in my mind that Cerro's own predicament as a stockholder dependent on Grupo Mexico's whim as a controller for registration rights

director has a conflict of interest because she is affiliated with a particular type of institution, like an activist fund. There must be evidence sufficient to permit a finding that the director in fact faced a conflict in the specific case.[33] Here, the trial record provided the necessary evidence.

But for the Settlement, Shackelton would have shared a common liability with RBC to the Class for his actions in putting Rural into play. RBC is therefore entitled to a credit under DUCATA in light of Shackelton's participation in the Settlement.

### d.    Davis

Whether Davis would have been entitled to exculpation, but for the Settlement, presents a close case. There is evidence suggesting that selfish motives played a role in Davis's actions. Critically, however, no one called Davis at trial, and I did not have an

---

influenced how Handelsman approached the situation."), *aff'd sub nom Americas Mining v. Therault*, 51 A.3d 1213 (Del. 2012).

[33] *See In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 667 (Del. Ch. 2013) (Strine, C.) (dismissing complaint challenging sale that was the product of a lengthy and thorough pre-signing market check in which plaintiff conceded that "all logical buyers were made aware . . . and that they all had the time and fair opportunity to bid" and rejecting allegation that private equity firm "typically flips companies it invests in every three to five years" and favored a sale to achieve liquidity for the investors in one of its funds and to invest in a new fund); *Trados II*, 73 A.3d at 54 ("At trial, the plaintiff could not rely on general characterizations of the VC ecosystem. The plaintiff had to prove by a preponderance of evidence that Prang was not disinterested or independent in this case."); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1036 (Del. Ch. 2012) (Strine, C.) (applying general rule of equal treatment where controlling stockholder received same consideration as minority in third party sale to dismiss challenge to transaction; recognizing there could be "very narrow circumstances in which a controlling stockholder's immediate need for liquidity could constitute a disabling conflict of interest irrespective of pro rata treatment" but rejecting liquidity-based interest given lack specific allegations in complaint).

opportunity to evaluate his credibility. It my view, it would take a powerful and persuasive evidentiary showing to permit a court to find *in absentia* that a director acted disloyally or in bad faith. RBC had the burden to show that Davis was not entitled to exculpation. On balance, RBC failed to meet it.

Like Shackelton, Davis had personal circumstances that inclined him towards a near-term sale. In fall 2010, he served on a dozen public company boards, making him an "over-boarded" director for purposes of an ISS voting policy. Davis was particularly concerned about avoiding a recommendation against his re-election as the Chairman of the Board of Atlas Air Worldwide Holdings, Inc. After a meeting with ISS facilitated by Atlas Air, Davis agreed to reduce his number of directorships to six by April 2011. Davis also had a potential interest in a sale because he often has joined boards as a hedge fund nominee or as an outside director acceptable to stockholder activists. A near-term sale of Rural would reduce Davis's number of board seats and let him exit on a professional high note. It also would let Davis keep over $200,000 of Rural equity that would vest on a change of control, but which he would lose if he resigned voluntarily. The trial record indicated that Davis set a personal deadline of April 1 for Rural to announce a sale; otherwise, he would resign from the Board. *See* Liability Op., 88 A.3d at 65.

Like Shackelton, Davis acted consistent with his personal interests. Most significantly, after the aborted consortium process, Davis matched Shackelton's anger towards DiMino and joined with Shackelton in disciplining Rural's CEO. *Id.* at 66. Davis was a member of the Special Committee, and, during the sale process, he pushed for a near-term outcome that would meet his personal deadline for leaving the Board. *Id.* at

103. But he was less involved than Shackelton and allowed Shackelton and RBC to drive the sale process, primarily because he was busy with his other professional responsibilities. *Id.* at 71, 73.

If Davis had testified at trial and performed poorly or been impeached on cross examination, then I might have concluded that exculpation would have been unavailable. In the end, the evidence introduced at trial was not sufficient to prove that Davis' actions fell within one of the exceptions to Section 102(b)(7). RBC is therefore not entitled to any credit under DUCATA as a result of Davis's participation in the Settlement.

### e. DiMino

As with Shackelton, the evidence convinces me that DiMino would not have been entitled to exculpation. Rather than supporting a near-term sale because it was in the best interests of Rural's stockholders, DiMino did so in deference to Shackelton and Davis and because it advanced his personal financial interests. As discussed, DiMino had opposed the consortium's bid, but, after being chastised by Shackelton and Davis, he fell into line. "From that point on, DiMino supported a sale and deferred to Shackelton." Liability Op., 88 A.3d at 66. Davis testified that self-interest contributed to DiMino's change of heart:

> [T]he light bulb finally went over his head that [a private equity buyer would] probably ask him to run it, and given the way that his relationship with the Board—our Board had deteriorated, I think at some point, he came to the conclusion he would be better off with a different Board, and a new owner would bring a different Board, on top of which he was going to prematurely cash out on the equity that he had received less than a year earlier. And probably if he was given the job back, would get more equity. It was a very good deal for him. He finally figured it out.

*Id.* After the Special Committee decided to hire RBC, DiMino emailed Munoz, saying "[w]ell done, let's get this baby sold!" *Id.* at 68. After the Merger closed, DiMino emailed a friend to say that he now had "new bosses" and that it was "[b]etter to be a private company than public" with "[a]ll good news here." JX 589.

As with Shackelton, I cannot claim to have read DiMino's mind or know his true intentions. But having heard him testify and considered the evidence, I believe that his support for a near-term sale stemmed in large part from his desire to go along with Shackelton and Davis, facilitated by the financial benefits he would receive from a transaction. RBC has carried its burden to show that DiMino would not have been exculpated, and that, but for the Settlement, he would have shared a common liability with RBC to the Class. RBC is therefore entitled to a credit under DUCATA in light of DiMino's participation in the Settlement.

### f.      Walker, Holland, and Conrad

Walker, Holland, and Conrad were disinterested and independent. Walker differs from Holland and Conrad only because he served on the Special Committee. Having heard Walker testify at trial, I believe he acted in good faith. Holland and Conrad did not testify at trial, and there is no evidence that either of them acted disloyally. Had the case proceeded to judgment against these directors, they would have been exculpated from liability. RBC is therefore not entitled to any credit under DUCATA for their participation in the Settlement.

87

### 2. Moelis

RBC contends that the reasoning advanced in the Liability Opinion for holding RBC liable on the Sale Process Claim applies equally to Moelis, such that the Liability Opinion has effectively held that Moelis and RBC are joint tortfeasors. RBC also argues that if Moelis were not a joint tortfeasor, then the Liability Opinion could not have found that the directors breached their fiduciary duties:

> Given that the Directors relied jointly on RBC and Moelis, there could be no finding of breach of fiduciary duty by the Directors if Moelis's conduct here was not (in the Court's view) tortious. Otherwise, the Moelis advice would have had the effect of giving the Directors an independent, non-actionable basis for their actions. Thus, to the extent RBC is liable for aiding and abetting, Moelis is a joint tortfeasor.

Dkt. 369 at 17-18. Neither argument is sufficient to carry RBC's burden of proof.

Taking the theories in reverse order, Moelis does not have to be a joint tortfeasor for the directors to have breached their duties. Assume that Moelis gave sound advice, but that, as the Liability Opinion found, RBC gave skewed advice tainted by self-interest. The total mix of the advice contained the tainted advice, and the resulting combination of advice was what led the Board astray. It does not follow from the Liability Opinion's finding that Moelis's advice was necessarily tortious.

Nor does the reasoning advanced in the Liability Opinion for holding RBC liable apply equally to Moelis. Contrary to RBC's position, the Liability Opinion distinguished between the conduct and interests of the two investment banking firms. At the outset, their pitch books approached the proposed engagement from different standpoints. Moelis's presentation "stressed its growing M & A franchise" and "[t]he bulk of its

presentation examined a potential combination with AMR." 88 A.3d at 68. Moelis placed less emphasis on a sale of Rural. *Id.* Moelis noted that it would not seek to finance any of the bidders. *Id.*

RBC, by contrast, "devoted the bulk of its presentation to a sale and recommended coordinating the effort with the EMS process." *Id.* RBC did not disclose that it planned to use its engagement as Rural's advisor to capture financing work from the bidders for EMS. Despite advising that the credit markets were open for acquisition financing, RBC proposed to offer staple financing to the potential buyers in any transaction. *Id.* When laying out the structure of a potential sale process, RBC only discussed private equity firms and cited its close relationships with private equity sponsors. *Id.* Focusing on private equity firms, particularly those having existing relationships with RBC, helped RBC achieve its goal of providing staple financing for the deal. Moelis did not face similar conflicts.

The Special Committee decided to hire RBC, and RBC understood that it was being given a mandate to sell Rural. Shackelton then decided to bring in Moelis as secondary advisor. The Liability Opinion found that Moelis "played a secondary role in advising the Board." 88 A.3d at 63; *see id.* at 69.

During the final negotiations, RBC pushed hard to be included in Warburg's financing package. Moelis did not. The plaintiffs established at trial that the information that RBC provided to Rural for the Proxy Statement contained materially false and misleading information. No similar showing was made regarding Moelis, either by the plaintiffs at trial or by RBC at any point.

In making the factual findings that resulted in the ruling against RBC, the court "placed the least weight on the testimony of the two RBC managing directors who appeared at trial" because the court found "[t]heir accounts at times strained credulity, and the plaintiffs successfully impeached their testimony on multiple occasions." *Id.* at 63-64. No one from Moelis testified at trial, and the court did not make any adverse findings regarding the credibility of any Moelis witness.

Based on the trial record and the findings in the Liability Opinion, RBC and Moelis were not similarly situated, and the Liability Opinion's reasoning does not extend to Moelis. RBC failed to prove that Moelis was a joint tortfeasor and cannot claim a settlement credit under DUCATA relating to Moelis's participation in the Settlement.

## F.    Relative Fault

Under the foregoing analysis, RBC, Shackelton, and DiMino qualify as joint tortfeasors for purposes of determining RBC's share of responsibility for the damages suffered by the Class. RBC argues that, under DUCATA, responsibility must be allocated pro rata, which RBC construes to mean equally. Under RBC's approach, each joint tortfeasor would be allocated a one-third share, resulting in judgment against RBC for one third of the damages suffered by the Class. That mechanistic approach does not accord with how DUCATA operates.

Under DUCATA, a joint tortfeasor that pays more than its proportionate share of a liability is entitled to seek contribution from the other joint tortfeasors. A joint tortfeasor's entitlement to a money judgment for contribution arises when that joint tortfeasor "has by payment discharged the common liability or has paid more than his or

90

her pro rata share thereof." 10 *Del. C.* § 6302(b). DUCATA contemplates two methods for determining the prorated share that one joint-tortfeasor can seek from another. The basic principle is to divide the damages for which the defendants are responsible equally among all defendants; however, "[w]hen there is such a disproportion of fault among joint tortfeasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tortfeasors shall be considered in determining their pro rata shares." *Id.* § 6302(d); *see Askanase v. Fatjo*, 148 F.R.D. 570, 575 (S.D. Tex. 1993) ("Title 10, § 6302 of the Delaware Code provides a right of contribution among joint tortfeasors, determined either by calculating equal pro rata shares or by taking into consideration the relative degrees of fault of the tortfeasors.").

RBC cites one decision that has construed the term "pro rata" to mean "equal." *See In re Masters Mates & Pilots Pension Plan & IRAP Litig.,* 957 F.2d 1020, 1028 (2d Cir. 1992) ("The *pro rata* rule apportions an equal share of the liability to each defendant in a lawsuit."). DUCATA uses the term "pro rata" to mean "proportionate," which is the plain meaning of the term. *See, e.g.*, American College Dictionary 1098 (3d ed. 1993) (defining "pro rata" as "[i]n proportion; according to a factor than can be calculated exactly"); BLACK'S LAW DICTIONARY 1340 (9th ed. 2009) ("proportionately"). During the debates over the Uniform Act of 1939, Professor Gregory touched on this very point:

> It had occurred to the Advisors and to me that the meaning of "pro rata" was sufficiently understood so that it would not require separate definition . . . Of course, it does not necessary imply equality. . . . You might have a 60-40 per cent. division for instance between two tortfeasors and it seems

> to me no matter what the basis for dividing the loss is, there could be no objection to the use of the phrase "pro rata." At least I cannot perceive any.

Discussion, *supra*, at 349-50. Consequently, "if fault among 'joint tortfeasors' is found to be disproportionate, the pro rata share of those tortfeasors is determined by reference to their relative degrees of fault." *Cox v. Del. Elec. Coop., Inc.*, 823 F. Supp. 241, 246 (D. Del. 1993).

The Restatement (Third) embraces the principle of relative fault and explains at length why it is superior to the primary alternatives. *See* Restatement (Third) § 23 & Reporters' Note cmt. e. In the field of admiralty law, after extensive consideration of the various alternatives, the United States Supreme Court adopted the rule of relative, or proportionate fault. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 211-21 (1994). The PLSRA adopted the principle of relative fault based on percentage of responsibility. 15 U.S.C. § 78u-4(f). Commentators discussing this provision have explained its superiority over alternative methods. *See, e.g.*, Marc I. Steinberg & Christopher D. Olive, *Contribution and Proportionate Liability Under the Federal Securities Laws in Multidefendant Securities Litigation After the Private Securities Litigation Reform Act of 1995*, 50 SMU L. Rev. 337, 361-367 (1996).

The Liability Opinion imposed liability on RBC for both the Sale Process Claim and the Disclosure Claim. RBC was solely responsible for the Disclosure Claim, which could be viewed as an independent cause of the damages suffered by the Class and justify imposing 100% of the damages on RBC. In terms of allocating a percentage of the overall fault, however, the two claims can be weighted equally on the premise that each

led to the same injury. As the party solely responsible for the Disclosure Claim, RBC is allocated 50% of the responsibility for the damages suffered by the Class.

This leaves 50% of the responsibility to be allocated for the Sale Process Claim. The Liability Opinion identified two sets of breaches of duty that led to liability on the Sale Process Claim: the breaches of duty that occurred when Shackelton and RBC initiated the sale process without Board authorization and in conjunction with the EMS sale and the breaches of duty that occurred during the final approval of the Merger. For purposes of allocating a percentage of the 50% fault attributed to the Sale Process Claim, the two breaches can be weighted equally.

This decision has held that, under the unclean hands doctrine, RBC cannot seek contribution and is not entitled to any settlement credit for the breaches of duty that occurred during the final approval of the Merger. RBC is therefore allocated an additional 25% of the responsibility for the damages suffered by the Class to account for the breaches that took place during final approval.

The remaining 25% of the responsibility for the damages suffered by the Class relates to the breaches of duty that occurred when Shackelton and RBC initiated the sale process without Board authorization and in conjunction with the EMS sale. RBC carried its burden of proof to show that, but for the Settlement, Shackelton and DiMino would have been jointly liable to the Class for those breaches of duty. Shackelton warrants a greater share of the responsibility than RBC and DiMino because he led this phase of the process. RBC in turn warrants a greater share of responsibility than DiMino because RBC eagerly supported Shackelton and helped push for a near-term sale. DiMino went along

after Shackelton and Davis educated him about who had power in the boardroom and what they wanted to see happen. At the risk of implying a false precision to the analysis, this decision allocates 10% responsibility to Shackelton, 8% to RBC, and 7% to DiMino.

Based on the foregoing allocation, 17% of the responsibility for the damages suffered by the Class is attributable to Shackelton and DiMino, who were joint tortfeasors who received releases from contribution in the Settlement. RBC is entitled to a reduction in its liability equal to the greater of (i) the share of responsibility attributable to the joint tortfeasors or (ii) the settlement payments made by the joint tortfeasors. *See* 10 *Del. C.* §§ 6304(a) & (b); *Mullins*, 637 A.2d at 7; *Farrall v. A.C. & S. Co.*, 586 A.2d at 664. The 17% share of responsibility has a dollar value of $15,525,004.28, which is greater than the $11.6 million in settlement payments ($6.6 million by the directors and $5 million by Moelis). Because the dollar value of the share of responsibility is greater than the settlement payments, RBC's liability is reduced by the former amount.

If the dollar value of the 17% share of responsibility had been smaller than the amount of the settlement payments, then this decision would have to wrestle with whether RBC's liability should be reduced by the full amount of the settlement payments. *See* Eggen, *supra*, at 1714-15. The Delaware Supreme Court held in *Mullins* that a settlement payment by a non-joint tortfeasor constituted a payment from a collateral source and would not result in a double recovery for purposes of the one satisfaction rule. The *Mullins* court did not have to consider a situation where some of the settling parties were joint tortfeasors and others were not. Under *Mullins*, it is possible that RBC only could receive a deduction in the amount of its liability equal to the portion of the

94

settlement payment attributable to Shackelton and DiMino, and that RBC would not receive a deduction in the amount of its liability for the portion of the settlement payments attributable to the other five settling defendants, whose payments would constitute a collateral source. Because of the dollar value of the joint tortfeasors' share of responsibility relative to the total settlement payments, this decision need not confront that possibility.

## III.    CONCLUSION

The Class suffered total damages of \$91,323,554.61. RBC is responsible for 83% of the damages. Judgment is entered against RBC in the amount of \$75,798,550.33. Pre- and post-judgment interest is awarded at the legal rate from June 30, 2011, until the date of payment.